9 So.2d 473

**COYLE et al. v. NORTH AMERICAN OIL CONSOLIDATED et al.**

**No. 36205.**

Feb. 2, 1942.

Rehearing Denied June 29, 1942.

A. S. Drew, of Minden, for appellants.

Dimick & Hamilton and John B. Files, all of Shreveport, for appellees.

ODOM, Justice.

Plaintiffs own 120 acres of land in one tract, situated in what is known as the Cotton Valley Oil Field in Webster Parish,

the land being described as the N.E. ¼ of the S.E. ¼ of Section 29, and the N. ½ of the S.W. ¼ of Section 28, Township 21 North, Range 10 West.

On August 26, 1936, they executed an oil and gas lease in favor of M. Carl Jones, covering the N.E. ¼ of the S.E. ¼ of Section 29. Jones, the lessee, transferred the lease to Elva M. Austin, and Austin in turn transferred it to the North American Oil Consolidated, one of the defendants.

On the same day, Robert M. Coyle, one of the plaintiffs, granted an oil and gas lease to Mrs. Sibyl York, wife of Sam York, covering the N.E. ¼ of the S.W. ¼ of Section 28. Mrs. York assigned the lease to Austin, and Austin assigned it to the North American Oil Consolidated.

On August 25, 1936, Robert M. Coyle leased for oil development the N.W. ¼ of the S.W. ¼, Section 28, to the Root Petroleum Company. The North American Oil Consolidated is the present owner of the lease covering the N.E. ¼ of the S.E. ¼ of Section 29 and the N.E. ¼ of the S.W. ¼ of Section 28, and the Root Petroleum Company is the present owner of the lease covering the N.W. ¼ of the S.W. ¼ of Section 28. These companies are the defendants in two suits brought by the plaintiffs to cancel the leases. The issues involved in each of the suits are identical, and for that reason the two suits were consolidated for the purpose of trial.

In the Cotton Valley Oil Field there are at least two well defined and separate strata of oil-bearing sands. One is known as the Travis Peak sand or stratum, and the other is designated as the Bodcaw or Lower Marine formation or stratum. Oil or distillate is produced from the Travis Peak sand or stratum by drilling to a depth of from 5,500 to 8,000 feet. The Bodcaw or Lower Marine sand or stratum begins at a depth of 8,000 feet and extends from that depth down.

The leases here involved contain the usual stipulation that, in case oil, distillate, or gas is discovered and produced from the land within the primary term of the leases, if they be kept alive for that time, then the leases shall remain in force and effect so long as any one of those commodities is produced. Plaintiffs alleged, and it is admitted, that the leases have been developed in so far as the Bodcaw or Lower Marine stratum is concerned. One of the defendants drilled a well on the N.E. ¼ of the S.E. ¼ of Section 29 to a depth of 8,200 feet, which well is now producing oil in paying quantities. The other defendant drilled a well to the same depth on the land in Section 28, which well is also producing oil in paying quantities. But no oil, distillate or gas has been produced from the Travis Peak sand or stratum.

Plaintiffs alleged in each of their suits that, while defendants had made no effort to develop the leases on their land in so far as the Travis Peak sand or stratum is concerned, yet defendants held leases on lands south of and adjacent to plaintiffs' land and had drilled two wells on those lands into the Travis Peak sand, which wells had been producing oil or distillate in paying quantities and were producing at the time these suits were filed. They alleged further that the wells on the lands

south of theirs were constantly draining the oil and distillate from their lands, and for that reason it was the duty of defendants to drill offset wells on plaintiffs' land in order to protect their interest. While there is no stipulation in the leases here involved requiring the lessees to drill offset wells in case of such drainage, plaintiffs alleged, and this seems to be conceded by counsel for defendants, that there was an implied obligation resting upon the lessees to drill offset wells in order to protect the interest of the lessors. Because there had been no offset wells drilled, plaintiffs prayed that the leases be cancelled. They alleged that the failure of the lessees to drill offset wells had resulted in serious damage to them on account of the alleged drainage, and in each suit prayed for judgment against defendants in amounts exceeding $50,000.

In the alternative, plaintiffs alleged that, in case it should be held that they were not entitled to have the leases cancelled on account of the lessees' failure to drill offset wells, then, in that event, they were entitled to have the leases cancelled in so far as the Travis Peak sand or stratum was concerned, because the lessees had abandoned that sand or stratum. They alleged that the lessees' failure and refusal to develop was an abandonment.

Defendants in limine filed exceptions of no cause and no right of action. These exceptions were grounded upon the proposition that, according to plaintiffs' allegations, oil was being produced from the Bodcaw or Lower Marine formation at the time the suits were filed, and that there-

fore the lessees had complied with their obligation to develop as provided in the leases. These exceptions were sustained by the trial court in so far as the demand to cancel the leases in their entirety was concerned. The court's ruling seems to have been based upon the theory that the separate and distinct oil-bearing sands or strata were two separate and distinct oil fields, and, inasmuch as plaintiffs' allegations showed that the Bodcaw or Lower Marine sand or field had been developed by the production of oil therefrom, the leases could not be cancelled in so far as that field was concerned; but that plaintiffs might have a cause of action to cancel the leases in so far as the Travis Peak sand or field was concerned. Counsel for plaintiffs did not except to the ruling of the court, and plaintiffs' demand to have the leases cancelled in so far as the Lower Marine sand or field is concerned has been abandoned.

We are not called upon to decide in this case, and do not decide, the question whether, in a case of this kind where it is shown that there are two or more separate and distinct strata of oil-bearing sands in land, each stratum should be considered a separate and distinct oil field. But, for the purposes of this decision, the Travis Peak sand or stratum will be considered as one field, and the Lower Marine sand or stratum as another, or separate, field. We shall consider these as separate and distinct fields, because counsel for the respective litigants concede that they are separate fields. In oral argument and in briefs they speak of them as separate fields

in the same sense as two separate and distinct tracts of land from which minerals are produced are separate fields.

There was judgment in the lower court rejecting plaintiffs' demands and ordering their suits dismissed at their costs. From this judgment plaintiffs appealed.

We take up first the question whether plaintiffs are entitled to have these leases cancelled because the lessees have failed, and now refuse, to drill offset wells.

In a case note found in 19 A.L.R. page 441, under the heading "Oil and Gas Lease—'Protection' Wells", the general rule relating to the particular issue here involved is stated as follows:

"The burden of proof is upon the lessor of land for oil and gas production to show that the location of wells upon adjoining premises is such that, taken in connection with the character of the oil or gas stratum, they will drain a sufficient quantity of oil from his premises to justify the lessee in going to the expense of drilling offset wells in order to save the oil or gas for their mutual benefit."

This is a general statement or expression of the rulings made by this court and the courts of Kentucky, Ohio, and Oklahoma. See especially the case of Hart v. Standard Oil Co., 146 La. 885, 84 So. 169.

Counsel for plaintiffs concedes that the above is a correct statement of the general rule and is applicable here in so far as this particular point is concerned. The question, then, is whether plaintiffs have discharged the burden of showing that the location of the wells upon the adjacent premises is such that they drain from their premises a quantity of oil sufficient to justify the lessees in going to the expense of drilling offset wells in order to save the oil or distillate for the mutual benefit of the lessors and the lessees.

The trial judge in his very able and elaborate written opinion stated his conclusion on this point as follows:

"We have carefully reviewed the testimony in this case and our conclusion is that the plaintiffs have entirely failed to sustain the burden of proving that the wells on the adjacent property will drain a sufficient quantity of oil from their premises (if any at all) to justify the lessee in going to the expense of drilling offset wells. In fact, the only evidence that may tend to indicate a slight drainage is from the testimony of the experts offered by the defendants.

"In considering the operations on adjacent premises together with the extent of the oil reservoir in the Travis Peak, the established facts are all found to be against plaintiffs."

In support of his conclusions, the judge quoted the testimony of witnesses called by plaintiffs and that of witnesses called by defendants. Among these were geologists who testified that they had been in the Cotton Valley Oil Field for a number of years and had observed conditions relating to the Travis Peak sand and had personally examined cores taken from numerous wells drilled there. They testified that it is now well known that the Travis Peak sand is what is generally referred to as lenticular in formation—that is, this oil-bearing

stratum of sand is not uniform in depth or thickness and is found only in spots. The field is a treacherous one for the reason that the operators can never be certain that they are drilling at the right spot in the land. The oil-bearing sand may be five, ten, or fifteen feet thick at one location in the land, and oil in paying quantities is easily produced at that spot. A short distance away, however, this oil-bearing stratum may be found to have diminished in thickness to such an extent that production is unprofitable, and, still further on, it may be found that this stratum has "pinched out" entirely. Some of the witnesses referred to the Cotton Valley Field, in so far as the Travis Peak stratum is concerned, as a "spotty" field.

The experts testified, and this is conceded, that in so far as the Bodcaw or Lower Marine formation is concerned, the oil-bearing sand is uniform, and that up to date each well drilled into that formation has produced, and is at present producing, oil or distillate in paying quantities. There is no uncertainty as to production from that sand. For that reason the operators begin drilling in all cases with the knowledge that they may have to drill into that sand in order to get production. In drilling into that sand, they necessarily have to drill through the Travis Peak stratum, and, when they reach the depth where oil is found in the Travis Peak sand, they are careful to take and examine cores of their drillings to see whether oil in paying quantities may be produced from that stratum. If they find oil in paying quantities in that stratum, they never drill deeper, the reason being that it is much less expensive to produce oil from that stratum than from the lower formation. The testimony shows that it costs from $35,000 to $45,000 to get production from the Travis Peak stratum, and about $120,000 to get production from the Lower Marine field. The largest and most expensive derricks and drilling rigs obtainable are used in the Cotton Valley Field for the reason that it is always contemplated that production may not be obtained from the Travis Peak and that it may be necessary to drill to a depth of more than 8,000 feet.

In developing the leases here involved by the drilling of two wells to the Bodcaw or Lower Marine formation, the testimony shows clearly that, when the Travis Peak stratum was reached, the drilling superintendent made numerous cores or tests to determine whether production could be had from that sand, and the tests showed definitely that production could not be obtained from that stratum. It was for that reason that the wells were drilled to the lower field.

It is reasonable to suppose that, if these operators could have produced oil in paying quantities from the Travis Peak stratum at a drilling cost of approximately $40,000, they would not have spent, as they did, approximately $120,000 to get production from the lower formation.

The two wells on the tract south of and adjacent to plaintiffs' property were drilled to the Travis Peak sand, and each produced oil in paying quantities. However, the testimony shows that one of the wells

is producing only about eight barrels a day at the present time, and that the other one is producing considerably more but has been reworked and made slightly deeper. The witnesses testified that the reason why no oil-bearing sand was found in the Travis Peak section by the operators in drilling the deep wells on plaintiffs' property was probably that this stratum of oil-bearing sand had "pinched out", or disappeared, between the wells on the adjacent land and those on plaintiffs' property.

One of plaintiffs' own witnesses was asked whether "the sand gets thinner as it goes north" in the vicinity of plaintiffs' property, and he said, "Possibly less productive." He was then asked, "Would it also be true if you went north of those wells [the wells drilled to the south of plaintiffs' property] that it would be still less productive?" His answer was, "That is a lenticular sand. It indicates that it is pinching out as it goes north."

The testimony shows that the two wells drilled on the property south of plaintiffs' land have been producing for slightly more than two years, and that up to the present time neither has produced enough oil to pay the expenses of drilling and operation. And, as we have stated, the testimony shows that the production from these wells is growing less all the time, and one of them produces only about eight barrels a day. The indications are that in the future neither well will produce enough oil to pay for its operation. Plaintiffs' witness, Mr. Egloff, testified that for 10 years he had been employed by the Hunt Oil Company as production superintendent; that the Hunt Oil Company had 27 wells in the Cotton Valley Field, and that he was familiar not only with the production from the wells owned by his company, but also with the production from many other wells in that field; that a great many of the wells drilled to the Travis Peak section had never "paid out", and that production from that sand was "falling off pretty fast". He was asked whether the production in the Travis Peak wells was not "going down very rapidly". His answer was "Yes".

After carefully reading the testimony of each of the witnesses called by plaintiffs and each of those called by defendants, we are convinced that the trial judge did not err in his finding that the plaintiffs had utterly failed to make out their case on this point.

As to the alternative plea that the leases be cancelled in so far as the Travis Peak formation or field is concerned, on the ground that it has been abandoned by the lessees, the trial judge held that there had been no abandonment of that field. Both in oral argument and in briefs, counsel for plaintiffs has argued at length and most earnestly that the trial judge erred in so holding. The major point stressed by him was that, in as much as the lessors had not yet developed the Travis Peak field and had refused to do so, this field should be returned to the lessors in order that they might themselves develop it. He urged that we reverse the decision as to that point.

But, if we should conclude that the judge erred in his ruling on that point, we could not render judgment cancelling the leases,

for the reason that all of the parties who are at present interested in them are not before the court. It is alleged, and the statement of facts shows, that the N.E. ¼ of the S.E. ¼ of Section 29, owned by plaintiffs, has been unitized with the 40 acres of land west of and adjacent to it by a pooling agreement entered into by the owners of mineral interests and royalties in these two 40's. It is alleged in the second suit that the N.W. ¼ of the S.W. ¼ of Section 28, owned by plaintiffs, has been unitized with the N.E. ¼ of the S.W. ¼ of that section by a pooling agreement entered into by mineral holders in these two 40-acre tracts. Plaintiffs alleged that these mineral holders should be made parties to the suits in order that they might assert whatever rights they had, and prayed that these pooling agreements be cancelled. No issue was joined between plaintiffs and the persons who had acquired interests in these leases through the pooling agreements. They failed to answer, and there was no default taken against them. Any judgment rendered against them would be an absolute nullity. Code of Practice, Article 606, paragraph 4; Article 612. See, also, Code of Practice, Articles 357, 358, 359, 360.

In so far as the issue of abandonment of the leases is concerned, it is necessary that the case be remanded in order that all interested parties may be cited and served according to law.

For the reasons assigned, the judgment appealed from, rejecting plaintiffs' demands that the leases be cancelled on the ground that the lessees had failed and refused to drill offset wells, and rejecting their demands for damages is affirmed. As relates to the issue of abandonment, the judgment is set aside, and it is ordered that the case be remanded to the lower court in order that all parties who acquired interests in the leases as a result of the unitizing and pooling agreements mentioned may be cited and served according to law; costs of appeal to be paid by plaintiffs-appellants, all other costs to await results.

O'NIELL, C. J., concurs in the decree but not in the expression that the provisions of the code that are applicable to ordinary leases are applicable also to mineral leases.

### On Rehearing.

PONDER, Justice.

A rehearing was granted in this case on the application of the plaintiffs and the application of the defendants. Both, the plaintiffs and the defendants, applied for a rehearing solely and only as to that part of our decree relating to the plaintiffs' alternative demand, seeking to have the leases canceled insofar as the Travis Peak sand or stratum is concerned on the ground that the defendants have abandoned this sand or stratum. The plaintiffs and defendants have raised no complaint as to our holding herein in other respects. In fact, all the parties to this suit concede that the holding is correct except as to the alternative demand. All the parties to this suit contend that there is no necessity for the remanding of the case for the purpose of making those who have acquired interests in the leases as a result of the unitizing

and pooling agreements involved herein parties to this suit. After the rehearing was applied for the various parties who had acquired interests in the leases, as a result of the unitizing and pooling agreements, appeared herein by way of answer to the appeal, urging this court to pass on the alternative demand. The plaintiffs have objected to this answer on the ground that they are not necessary parties to the suit. Under the circumstances, we granted a rehearing in this case in order that the alternative demand might be considered. The matter has been submitted, on rehearing, for our determination.

The plaintiffs contend that the lessees' failure and refusal to develop the Travis Peak sand or stratum operated as an abandonment, and that the leases should be canceled insofar as this sand or stratum is concerned. They argue that inasmuch as it is shown from the tests made in the two wells drilled by the defendants that the Travis Peak sand or stratum would not produce oil on this property, that the actions of the defendants in making no other effort to produce oil from this sand or stratum amounted to an abandonment of it.

The position taken by the plaintiffs is predicated on the ground that when there are two or more separate or distinct strata of oil bearing sands in lands, each should be considered a separate and distinct oil field. While we did not pass on this question on the original hearing of the appeal, yet we stated in the opinion handed down by us that the respective litigants conceded that the Travis Peak stratum and the Lower Marine stratum were separate fields. The defendants have taken exception to this statement and have strenuously argued that it was never their intention to convey to this court the idea that they in any way concede that the different levels of production constitute separate and distinct oil fields. They contend that it is only one oil field, irrespective of the level from which the oil is produced.

We have to look to the leases to ascertain just what the intentions of the parties were in this respect.

The rule is well established that mineral leases must be construed as leases, and that the codal provisions applicable to ordinary leases must be applied. Tyson v. Surf Oil Co., 195 La. 248, 196 So. 336.

"The duration and the conditions of leases are generally regulated by contract, or by mutual consent." Article 2684, Revised Civil Code.

"Agreements legally entered into have the effect of laws on those who have formed them." Article 1901, Revised Civil Code.

Under the provisions of Article 1945 of the Revised Civil Code, dealing with the interpretation of contracts, legal effect must be given to the contract according to the intent of the parties, and the intent is to be determined by the words of the contract, when these are clear and lead to no absurd consequences.

"When the intent of the parties is evident and lawful, neither equity nor usage can be resorted to, in order to enlarge or restrain that intent, nor can any law operate to that effect, unless it be some prohibition or other provision, which the parties had no right to modify or renounce." Article 1963, Revised Civil Code.

Under the terms of the leases involved herein, the defendants were granted the exclusive right of investigating, exploring, prospecting, and drilling for and producing oil, gas, and other minerals on these lands. The leases contain a stipulation to the effect that in case oil, distillate or gas is discovered or produced within the primary term of the leases, if they have been kept in effect, then the leases shall remain in force and effect so long as any one of those commodities is produced.

■ Under the plain and unequivocal terms of the lease contracts, the leases are to remain in full force and effect as long as oil is produced. Oil is now being produced in paying quantities under the leases from the Lower Marine stratum. There is no language used in the lease contracts to indicate that it was ever intended that different strata or levels were to be considered separate oil fields. Undoubtedly these lease contracts contemplate that they shall remain in force and effect as long as oil is produced from the lands, irrespective from what level or stratum it is found. If it had been otherwise, some provision to that effect would have been written in the contracts. Moreover, there is no evidence in this record going to show that the defendants ever had any intention of abandoning the Travis Peak stratum. The mere fact that the defendants drilled through the Travis Peak stratum, where no oil was found, to the Lower Marine stratum in order to find oil would not indicate any intention on their part to abandon the Travis Peak stratum. The defendants have complied with their lease contracts by producing oil on the lands from the level or stratum where the oil was found. Under the plain terms of their contracts, nothing more could be required of them.

For the reasons assigned, our original decree is amended by striking out that part of it which sets the judgment aside insofar as the issue of abandonment is concerned and ordering the case to be remanded to cite and serve, according to law, all parties who had acquired interests in the leases as a result of the pooling agreements. The judgment is further amended by rejecting the plaintiffs' alternative demand of abandonment. As thus amended, the judgment is affirmed at appellants' cost.