AYRES, Judge.
This is an action for the cancellation of .an oil, gas and mineral lease so far as it covers and affects plaintiff’s mineral interest in a tract of 180 acres of land in De-Soto Parish, Louisiana.
The basis of this action is that, notwithstanding a well was drilled on the leased premises, the well was not a producer of either oil, gas or other minerals in commercial or paying quantities, and, as a consequence, it is contended the lease terminated with the expiration of its primary term.
The defense is that the well was a producer of gas but, for the want of a market due to the lack of adequate pipeline facilities, the well was not placed in production but was shut in; and. that, until the expiration of the primary term, delay rentals were paid. By reason of the tender of shut-in royalty for periods subsequent to the expiration of the primary term of the lease, it was contended the lease had been maintained in full force and effect beyond its primary term.
Deemed essential to an understanding of the disposition to be made of the issues presented for resolution is a statement of the material facts of the case. Under date of January 16, 1947, Elizabeth and Boykin -W. Pegues, the owners of the fee simple title to a tract of 772 acres, executed an oil, gas and mineral lease to one Fred L. Kyle for a primary term of 10 years “ * * * and as long thereafter as oil, gas or other minerals are produced from said lands or land with which said land is pooled hereunder.” (Emphasis supplied.) Soon after execution of the aforesaid lease, it was assigned to defendants, who, during September, 1948, began operations for the drilling of a well on the leased premises at the approximate center of the SE14 of NW14, Section 34, Township 15 north, Range 14 west. This well was completed as a producer of gas in November, 1948, and was immediately shut in. Except for small quantities of gas utilized for other drilling operations in the vicinity, no production was had. On January 16, 1952, a release was executed by defendants of the aforesaid lease and as *481 signment, except as to the 180 acres upon which the well was drilled and completed. On September 13, 1955, plaintiff acquired the fee simple title to the 772-acre tract, together with J4 of the minerals thereon. This acquisition was from Riemer Calhoun, who had acquired it from Boykin W. Pegues, who had previously, in 1949, inherited, from his mother, Mrs. Elizabeth W. Pegues, her undivided Y¡ interest therein.
During the interval following the drilling and completion of the aforesaid well, until the date of the expiration of its primary term, defendants paid annually the delay rentals stipulated in the lease. On December 28, 1956, before the expiration of the primary term January 16, 1957, defendants tendered to plaintiff $18.75 as his proportionate part of the shut-in royalty to cover a period of one year, that is, from January 16, 1957, to January 16, 1958, or for the year immediately following the expiration of the primary term of the lease. A similar tender was made January 2, 1958, covering the next succeeding 12 months. These tenders were refused. A formal written demand was made upon defendants October 30, 1957, for the cancellation of the lease as to the 180 acres remaining thereunder. The demand was refused and this suit followed on February 24, 1958.
Subsequent to the aforesaid demand but prior to the institution of this action, the Commissioner of Conservation issued an order, effective May 1, 1958, creating a 360-acre unit comprising the NW14, W'}4 of NE14, m/2 of SW14, and the NW}4 of SE14, Section 34, Township 15 north, Range 14 west, which included plaintiff’s 180 acres, for the production of gas and condensate from the then producing interval of the Rodessa Zones, and designated the aforesaid well as the unit well. Pursuant to that order, the well was placed in production May 13, 1958, and deliveries were made to or in a pipeline of the Arkansas-Louisiana Gas Company. The sales and deliveries from that date to February 1, 1960, aggregated'419,519 Mcf of gas at a net value of $44,080.91 and 2,690.69 bbls. of condensate at a net value of $7,264.88.
After trial, there was judgment rejecting plaintiff’s demands, and he appeals.
The issues presented by this appeal concern and relate to the effect, vel non, (1) of the payment of delay rentals from 1948-1956, inclusive, in view of the fact that a well capable of producing gas and condensate in paying quantities had been completed in 1948, but which, due to the lack of a market for the want of pipeline facilities, the well was closed and remained shut in, and (2) of the tender of shut-in royalty to cover periods of time subsequent to the expiration of the primary term of the lease.
The resolution of the questions thus presented requires a statement concerning, and an interpretation of, the appropriate provisions of the lease.
Section 2 of the lease provides:
“Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called ‘primary term’) and as long thereafter as oil, gas or other minerals are produced from said lands or land with which said land is pooled hereunder.”
Section 3 provides for the usual royalties to be paid by the lessee including, on oil, 14 thereof in kind or, if sold, Ys of the market price; and, on gas, Ys of the market value of that used by the lessee in operations not connected with the leased premises, and Ys of the amount received from sales made by the lessee at the well. In addition, this section contains this provision:
“Where gas from a well producing gas only is not sold or used because of no market or demand therefor, lessee may pay as royalty $50.00 per well, per year, payable quarterly, and upon such payment it will be considered that gas is being produced within the meaning of Article 2 of this contract.”
*482 The lease, Section'4, provides that, if operations for drilling are not commenced on said land within one year from its date, the lease shall terminate unless the lessee shall pay or tender to the lessor the sum of $1 per acre to cover the privilege of deferring the commencement of such operations for another period of 12 months. It was also recited that deferments for similar intervals during the primary term may be effected in like manner and upon like payments.
From the language used, the payment or tender of the aforesaid delay rentals was for the purpose of deferring the commencement of drilling operations and, thus, their payment is inappropriate to the situation shown to exist here. There is no need, necessity, or requirement shown in the lease for the payment of delay rentals for deferring the commencement of drilling operations which were already successfully done and completed, and after a well had been brought in capable of producing gas in paying quantities.
Nor do we find the provisions of Section S of the lease appropriate. In that section' it is provided:
“If prior to discovery of oil, gas, sulphur or other mineral on said land, lessee should drill a dry hole or holes, thereon, or if after discovery of oil, gas, sulphur or other mineral, the production thereof should cease from any cause, this lease shall not terminate if lessee commences operations for addi- • tional drilling or reworking within sixty days thereafter or (if it be within the primary term) commences additional drilling operations or commences or resumes the payment or tender of rentals on or before the rental paying date * * (Emphasis supplied.)
These provisions are inapplicable by reason of the prior discovery of gas and condensate, the production of which had not ceased because the well had not been placed in production.
If a well is completed and placed in operation as a paying producer during the primary term of the lease, the lease is maintained in force by such production. However, upon the commencement of drilling operations and the successful completion of a well as a producer, the delay rental clauses have no further function to perform, and the right to pay delay rentals as a means of maintaining the lease in force ceases to exist. Therefore, since the condition under which the lease might terminate prior to the end of the primary term has been obviated by the commencement and completion of a well, it follows that the lease is continued in force for the remainder of the primary period without the payment of delay rentals — subject, of course, to the lessee’s compliance with the other expressed and implied covenants of the lease.
A similar result was reached by a Texas court of civil appeals in Morriss v. First Nat. Bank of Mission, Tex.Civ.App., San Antonio, 1952, 249 S.W.2d 269. Under the terms of the particular lease therein involved, under which the lessee was obligated to make shut-in royalty payments, the court held that the shut-in payments were a substitute “production” under both the habendum and the delay rental clauses of the lease, and that, after such “production” was achieved, the option to pay delay rentals ceased and the duty to pay royalty commenced.
In such instances as existed in the cited case, as well as in the instant case, the payment of delay rentals should be terminated following the capping of a producing well and the lease should then be continued in effect by virtue of the proper shut-in gas royalty payment under the terms of the lease, both during the primary term and subsequent thereto, as long, as the conditions permitting the continuance under the lease remain unchanged.
Therefore, we conclude that the option to pay delay rentals ends and the *483 duty to pay royalty begins with production; that shut-in royalty payments are a substitute for production and eliminate any necessity for the payment of delay rentals; and that, accordingly, the payment of delay rentals, after the completion of a well capable of producing gas in paying quantities, and after the well has been shut in because of no market or demand therefor, was .not required under the terms of the lease, and that such payment is, moreover, ineffective so far as continuing the lease in force and effect.
What, then, is the effect of defendants’ failure to pay shut-in royalty as provided under Section 3 of the lease? In this connection, it may be pointed out that such royalty has been neither paid nor tendered for the period from the completion and closing in of the well in November, 1948, to and inclusive of 1956. The tenders as made on December 28, 1956, and January 2, 1958, were made for the purpose of covering only subsequent periods of time.
The payment of royalty under an oil, gas and mineral lease, as well established in the jurisprudence of this State, is the payment of rent and is not the payment of a price for the oil or gas rights as if they were sold. Milling v. Collector of Revenue, 220 La. 773, 57 So.2d 679; Roberson v. Pioneer Gas Co., 173 La. 313, 137 So. 46, 82 A.L.R. 1264; Logan v. State Gravel Co., 158 La. 105, 103 So. 526.
The rule is likewise well established that mineral leases are to be construed simply as leases and that the codal provisions applicable to ordinary leases must be applied. Milling v. Collector of Revenue, supra; Coyle v. North American Oil Consolidated, 201 La. 99, 9 So.2d 473; Tyson v. Surf Oil Co., 195 La. 248, 196 So. 336.
In this regard, it was observed in Milling v. Collector of Revenue, supra [220 La. 773, 57 So.2d 681]:
“From the inception of litigation with respect to mineral contracts and their interpretation, the articles of the Civil Code specifically covering the contract of lease (under Title IX, ‘Of Lease,’ Chapter 2, ‘Of Letting Out Things’), together with other articles applicable to the ordinary lease under ‘Conventional Obligations,’ ‘Privileges’ and ‘Prescription,’ have been consistently applied to mineral contracts possessing the characteristics of lease. For example, a lease affecting the whole property where the lessor was the owner of but an undivided interest was held valid under Article 2682, Spence v. Lucas, 138 La. 763, 70 So. 796; the lessor’s lien and privilege to secure rentals was recognized under Articles 3218 and 3219, Logan v. State Gravel Co., 158 La. 105, 103 So. 526; cancellation of gas lease for nonpayment of rent when due was ordered under Articles 2046, 2047, 2710, 2712 and 2729, Louisiana Oil Refining Corp. v. Cozart, 163 La. 90, 111 So. 610; the prescription of three years against a claim for arrearage of rent in the form of additional royalties was applied under Article 3538, Board of Com’rs of Caddo Levee Dist. v. Pure Oil Co., 167 La. 801, 120 So. 373; characteristics of a sublease as distinguished from an assignment were determined by application of Article 2725, Roberson v. Pioneer Gas Co., 173 La. 313, 137 So. 46, 82 A.L.R. 1264; remedy of a lessee in the case of disturbance of his possession was concluded under the provisions of Articles 2703 and 2704, Gulf Refining Co. of La. v. Glassell, 186 La. 190, 171 So. 846; the duration and conditions of such leases were held to come within the rule announced in Article 2684, Coyle v. North American Oil Consolidated, On Rehearing, 201 La. 99, 112, 9 So.2d 473; and the lessor was required to fulfill' the obligations enumerated in Article 2692. Texas Co. v. State Mineral Board, 216 La. 742, 44 So.2d 841.
*484 “In one of the early cases, decided almost twenty-five years ago when the members of the Court were trying to determine the law applicable to a mineral contract of lease, while it was said that ‘This is not an ordinary lease. It is more in the nature of a license,’ nevertheless the holding was that ‘it is governed by the Codal provisions relative to leases.’ Louisiana Oil Refining Corp. v. Cozart, supra, 163 La. at page 93, 111 So. at page 610. The view was subsequently affirmed, so that in a later case the following language was used: ‘We stress the fact that in every instance where the court had squarely before it the juridical nature or the proper legal classification of a mineral, oil, and gas lease the conclusion was reached that it was a contract of letting and hiring * * *.’ Gulf Refining Co. of La. v. Glassell, supra, 186 La. at page 200, 171 So. at page 849. The following excerpt shows the uniformity of the jurisprudence in this respect: ‘This court has consistently applied the codal provisions, whenever possible, to oil and gas leases for many years. Having declined to enact laws for the regulation of the oil industry and, particularly, having declined to adopt a Mineral Code, the Legislature has placed the stamp of approval upon the system of interpretation of oil' and gas contracts which this court has followed for so many years.’ Tyson v. Surf Oil Co., 195 La. 248, 268-269, 196 So. 336, 343, and in a recent case we observed: ‘The rule is well established that mineral leases must be construed as leases, and that the codal provisions applicable to ordinary leases must be applied.’ Coyle v. North American Oil Consolidated, supra, 201 La. at page 114, 9 So.2d at page 478 — italics ours.”
These principles were later emphasized and applied in Melancon v. Texas Company, 230 La. 593, 89 So.2d 135; Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132. These cases involved the failure to pay production royalties. It was contended and pointed out that the leases did not fix a time for the payment of production royalties, nor provide a right of cancellation for failure to pay, or for delay in paying, the royalties that have accrued. Such are the contentions of the defendants in the instant case.
In the Melancon case, the following observations and pronouncements were made which are particularly appropriate to the facts of the instant case [230 La. 593, 89 So.2d 142],
“In the system of interpretation of oil and gas contracts which this Court has followed for many years, the lessor’s royalty under the usual oil and gas lease is placed in the rent category. Such a characterization is well fixed in our law (see Milling v. Collector of Revenue, 220 La. 773, 57 So.2d 679, containing a summary and analysis of pertinent cases), and has given little trouble since this Court’s pronouncement of more than three decades past that ‘ * * * a mine or quarry, or land adapted to mining or quarrying, may be leased for a certain portion of the produce of such mine or quarry, and the fact that such portion is called “royalty,” instead of rent, is not of the least consequence.’ Logan v. State Gravel Co., 158 La. 105, 109, 103 So. 526, 527. The rule is equally well established that in construing mineral leases, ‘ * * * the codal provisions applicable to ordinary leases must be applied.’ Coyle v. North American Oil Consolidated, 201 La. 99, 114, 9 So.2d 473, 478; Tyson v. Surf Oil Co., 195 La. 248, 196 So. 336.
“The provisions of the LSA-Civil Code treating of the subject of lease, to be found under Chapters 1 and 2 of Title IX, Book III, and particularly those under the general heading ‘Of the Obligations and Rights of the Lessee’, stipulate that ‘The lessee is *485 bound ' * * * 2. To pay the rent at the terms agreed on’, Article 2710, and if he fails to pay the rent when due, he may be expelled from the property, Article 2712. Rent is, from the standpoint of the lessor, the primary motive for the contract, and was so recognized in the early case of Kron v. Watson, 14 La.Ann. 432, when this Court held that ‘The payment of rent, in pursuance of the terms of the contract of lease, is an essential engagement on the part of the lessee, and his non-compliance with it gives to the lessor a right to sue for the dissolution of the contract.’ Other provisions of the LSA-Civil Code, pertinent because under our law lease ‘is a synallagmatic contract, to which consent alone is sufficient * * * Article 2669, are found in the section treating ‘Of Conventional Obligations’, Title IV, Book III; therein it is stated that ‘When no term is fixed by the parties for the performance of the obligation, it may be executed immediately, unless, from the nature of the act, a term, either certain or uncertain, must be implied * * * ’, Article 2050; equity, usage and law may be resorted to in such cases, Article 1964; the word ‘usage’ is defined as ‘that which is generally practiced in affairs of the same nature with that which forms the subject of the contract. House rent in some cities is generally paid by the month; in others by the quarter. In a contract for the hire of a house, without expressing when the rent was to he paid, the deficiency would be supplied by proof of the usage, * * Article 1966. (Emphasis ours.)
“In the case of royalty based on gas and oil production it is the accepted custom, as reflected by this very record, to make such payments on a monthly basis, computed on the amount of gas and oil sold or run into the line from the well. A justifiable cause for delay in such payment might arise when there is a reasonable dispute as to those entitled to receive the royalties, or the amount due each, but no such factual situation is here presented, and we agree with the trial judge that a delay of fifteen months for no valid reason is unjustifiable and viola-tive of the terms of the contract.”
Thus, in the Melancon case it was held that a delay of 15 months in the payment of production royalty, for no valid reason, was unjustifiable and violative of the terms of the contract. In the instant case, there was a delay of approximately nine years and, as heretofore pointed out, there has been neither payment nor tender of the royalty covering that period of time.
While the cited cases concerned production royalties, the principles involved are equally appropriate where shut-in royalty is concerned. The logic that production royalty is rent and that the codal provisions relating to ordinary leases are applicable to oil, gas, and mineral leases has, at least, equal, if not greater, force to the provisions of a lease, relating to the payment of shut-in royalty, as, in those instances, the amounts payable are liquidated and specified, requiring little, if any, calculation or computation in contract to the complexities often encountered and the comprehensive calculations generally required as to production royalties.
We, therefore, conclude that the delay of payment and, indeed, the failure of payment of the shut-in royalty for a period of approximately nine years is unjustifiable and violative of the terms of the contract, and no valid reason or basis has been offered or established for such delay and failure. The conclusion is inescapable that defendants breached their contract and that such breach constitutes an adequate and sufficient basis for and warrants and works a forfeiture of the lease.
Defendants cite, in support of their contentions, these authorities: Sohio Petroleum Co. v. V. S. & P. R. R., 222 La. 383, *486 62 So.2d 615; Taylor v. Kimbell, 219 La. 731, 54 So.2d 1; Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339; Reid v. Gulf Oil Corporation, Tex. Civ.App., Beaumont 1959, 323 S.W.2d 107, affirmed by Tex., 337 S.W.2d 267.
These authorities are either inapposite or do not support defendants’ position.
It is contended, under the authority of the Sohio case, that it was optional with the 'lessee -as to the payment of shut-in royalty .and that, as a consequence of such option, the payment of delay rentals prevented the forfeiture of the lease. As heretofore pointed out, the payment of delay rentals was ineffective as continuing in effect the lease in the instant case.
There is no relationship, under the terms of the lease, between the payment of shut-in royalty and the payment of delay rentals. The requirements for the payment of each are separate and distinct. The payment of one has no bearing or effect upon the necessity or requirement for the payment of the other. The relationship or connection is between the provisions relating to the payment of shut-in royalty and the provisions concerning actual production. For instance, where a well capable of producing has been closed or shut in for the want of a market, payment of shut-in royalty is required in order that the well may be considered a producing well so as to maintain the lease in effect by “production” under Section 2 of the lease. The payment of shut-in royalty was not, therefore, in lieu of and as a a substitute for the payment of delay rentals, but was in lieu of and a substitute for production royalties.
As also pointed out, this shut-in royalty has not been paid or even tendered for a period of approximately nine years. No valid reason has been advanced or established that warranted or justified such action on the part of the lessees.
Moreover, the Sohio case is clearly distinguishable from the instant case in that nq objection was made there to the failure to pay shut-in royalty until after the completion of a second well. Furthermore, the- plaintiffs in that case failed to provide storage tanks or receptacles for their portion of the oil produced, as was incumbent upon them under the terms of the contract.
The holding in the Taylor case is likewise inapplicable in that the evidence there did not establish that the well drilled on the leased premises was capable of producing gas in paying quantities so as to entitle the lessees under the provisions of the lease to have the lease extended upon the payment of shut-in royalty. To the contrary, the record established that the well was not a producer of gas in paying quantities. The payment of shut-in royalty on a dry hole will not extend the term of a lease beyond its primary term for the reason that, for the payment to be effective, it must be in lieu of, or as a substitute for, actual production — and there was no actual production from the dry hole drilled in the Taylor case.
Nor do we find that defendants can derive comfort from the decision in either the Freeman or Reid case. In the former, the 10-year primary term of the lease expired April 7, 1940. On December 22, 1939, the lessee completed a gas well capable of producing in paying quantities, but none of the gas was ever sold or used off the premises for want of a market. The $50 annual payment as shut-in royalty was not tendered until four months after the expiration of the primary term. The Supreme Court of Texas held that the lease had terminated at the end of the primary term since there was no production at that time and since the royalty payment had not been made pri- or to that date so as to cause the well to be considered as a producing well within the meaning of the habendum clause.
To the same effect is the holding in the Reid case wherein the Supreme. Court of Texas held that under oil and gas lease to effect that lease should terminate if at expiration of primary term there was no production in paying quantities and that, upon making of shut-in royalty payment, it *487 would be considered'that gas-was produced, lease of land upon which a producing well had been drilled and capped, after expiration of primary term, terminated for lack of production even though there was no available market and such lease could not be revived by an attempt to pay shut-in royalty after termination of primary term.
Nor do we find any basis for holding that plaintiff was estopped, or had waived his rights to contest the validity, the continued existence or the effect of the lease by virtue of his acceptance of delay rentals following his acquisition of the property in 19S5. The burden of proof in such instances is upon one asserting estoppel to establish the essential facts upon which it is based. The record is barren of any proof that plaintiff knew, or had any information, at the time he accepted the delay rentals, that the well was a producer of gas in paying quantities. Indeed, he alleges in his petition that the well was not such a producer — such fact was only established by defendants’ testimony on the trial of the case. Although defendants knew, from the completion of the well, that it was a producer, that information was not shown to have been imparted to plaintiff prior to the filing of defendants’ answer.
Nor is any issue presented as to a demand upon or a placing of the defendants in default. The position of the defendants is that the payment of shut-in royalty was not required or necessary to be made.
 As to the allowance of attorney’s fees under LSA-R.S. 30:102, the stipulation of facts recites that, in the event the court decides plaintiff is entitled thereto, such fees may be fixed by the court. A fee of $5,000 was claimed. In cases where attorney’s fees may be allowed, recovery may not be had in the absence of proof that the fees have actually been paid or an obligation incurred for the payment of such fees. Melancon v. Texas Company, supra; Rhodes v. Collier, 215 La. 754, 41 So.2d 669. No proof was offered to substantiate this claim. Hence, this item will be dismissed as of nonsuit.
It appears appropriate to also point out that the stipulation filed in evidence contains this statement:
“That if plaintiff should prevail in this case, an accounting between the parties should be ordered of the accrued proceeds from the sale of production from said unit and of the expense of developing and operating the unit and constructing the pipe line and, if plaintiff does not-pay his proportion of said development and operating expenses and of the construction of the pipe line, defendants should be decreed to be entitled to receive and retain the proceeds of sale of gas and condensate to the credit of his interest until they shall have recouped the expenses at-, tributable thereto.”
The evidence, however, on this phase of the case is insufficient as a basis for a definitive judgment. Hence, for an accounting and settlement, the rights of all parties should be reserved.
Observation is also made that, after the trial of this case in the district court, the defendant, E. C. Laster, died. Mrs. Eugenia F. Laster was confirmed testamentary executrix and, in that capacity, has been made a party defendant.
For the reasons assigned, it is ordered, adjudged and decreed that the judgment •appealed be, and it is hereby, annulled, avoided, reversed and set aside; and
It is now ordered, adjudged and decreed there be judgment herein in favor of plaintiff Jackson B. Davis, and against the defendant, Mrs. Eugenia F. Laster, individually, and as testamentary executrix of the estate and succession of E. C. Laster, deceased, decreeing the cancellation of that certain oil, gas and mineral lease dated January 16, 1947, executed by Elizabeth W. Pegues and Boykin W. Pegues, afid *488 recorded January 24, 1947, under Register No. 180534, in Book 169, page 11 of the Conveyance Records of DeSoto Parish, Louisiana, covering the following-described property, to wit:
of the NE}4 and the SE14 of the NW14, Section 34; and SWJ4 of the SE14 and the S1/2 of the NWJ4 of the SE14, Section 27; Township 15 north, Range 14 west, Louisiana meridian, DeSoto Parish, Louisiana,
insofar as it affects plaintiff’s undivided yi mineral interest; and said lease is, accordingly, canceled.
It is further ordered, adjudged and decreed that plaintiff’s claim for attorney’s fee be, and the same is, dismissed as of nonsuit.
It is further ordered, adjudged and decreed that the rights of plaintiff and defendants to an accounting between them, as to the proceeds from the sale of production and as to a settlement of the expense of developing and operating the unit and constructing the pipeline in connection therewith, and for further compliance with the provisions of the stipulation recited hereinabove, be, and the same are hereby, specially reserved.
It is further ordered, adjudged and decreed that the defendants pay all costs, including the cost of this appeal.
Reversed and rendered.
GLADNEY, J., dissents and assigns written reasons.