432 So.2d 1095 (1983)
ACQUISITIONS, INC., Plaintiff-Appellee,
v.
FRONTIER EXPLORATIONS, INC., et al., Defendant-Appellant.
No. 82-808.
Court of Appeal of Louisiana, Third Circuit.
May 25, 1983.
*1096 M.F. Fayard, Jr., Bossier City, for defendant-appellant.
Frederic L. Miller, Shreveport, for plaintiff-appellee.
Before FORET, CUTRER and DOUCET, JJ.
DOUCET, Judge.
Acquisitions, Inc. filed a petition seeking judicial recognition of termination of a mineral lease executed in favor of Frontier Explorations, Inc. Subsequently, plaintiff filed a motion for summary judgment founded upon defendants failure to pay shut-in payments due pursuant to the lease. The motion was granted and the lease deemed terminated. Lessee-defendant appeals. We reverse.
On August 11, 1980, William J. Nesbitt and Jacqueline L. Nesbitt executed a mineral lease on their property located in the Northwest Quarter of the Northwest Quarter, Section 12-13-8, Natchitoches Parish, Louisiana, in favor of Frontier Exploration, Inc. The primary term of the lease was sixty days. On October 10, 1980, drilling on the property was begun. The completion date of the gas well was November 9, 1980. The well was shut-in for want of a pipeline and an available market. According to the lease, shut-in royalties for the remainder of 1980, in the amount of ONE HUNDRED ($100.00) DOLLARS per month, were due and owing to the Nesbitts in January 1981, and in January 1982. A total of fourteen (14) months of shut-in royalties were due and unpaid when payment was tendered on July 27, 1982 without demand by the Nesbitts.
On June 9, 1982 the Nesbitts apparently entered into a sale of minerals agreement with Acquisitions, Inc. On July 8, 1982 a demand for the release of the lease was sent by Acquisitions to Frontier. On July 14, 1982 Acquisitions, Inc. sent a letter to Frontier Exploration, Inc. informing Frontier that the lease had expired of its own terms due to non-payment of shut-in royalties. On July 20, 1982 a petition was filed by Acquisitions, Inc. alleging that the mineral lease from the Nesbitts to Frontier had expired on its own terms for failure to pay shut-in royalties on a timely basis. As stated above, payment of royalties for fourteen months was tendered from Frontier to the Nesbitts. No shut-in royalties were due Acquisitions, Inc. until January 1, 1983. After a preliminary default but prior to confirmation thereof, a general denial was filed by Frontier Exploration, Inc. Subsequently, a motion for summary judgment, along with supporting briefs and affidavits, was filed by Acquisitions, Inc. A brief in opposition to the motion for summary judgment was filed by Frontier on September 17, 1982. After hearing on the motion for summary judgment, judgment was granted in favor of the mover judicially recognizing termination of the lease. From that judgment, the lessee, Frontier Exploration, Inc., appeals.
The central question presented for our resolution is whether the shut-in payment provision of the lease creates a resolutory condition whereby failure to make payments automatically terminates the lease, or whether this provision provides for payment of "royalties" to which would apply the requirements of notice and delay pursuant to LSA-R.S. 31:137 et seq. The issue appears to be one of first impression since the adoption of the Louisiana Mineral Code in 1975. Accordingly, we consider an overview of the evolution of jurisprudence and statutory law on the matter appropriate.
In a case pre-dating the La.Mineral Code, Davis v. Laster, 242 La. 735, 138 So.2d 558, 96 A.L.R.2d 332 (1962), a gas well was shut-in during the primary term and the lessees paid delay rental for approximately nine years. The Second Circuit Court of Appeal held that the lease was forfeited for failure to pay shut-in royalties. 130 So.2d 479 (1961). The Louisiana Supreme Court reversed, holding that the lessor's acceptance of delay rentals modified the terms of the lease. With regard to forfeiture, the court noted that the right to such a remedy is dependent on the circumstances of the case and where a lessee's failure to pay *1097 sums due is the result of pardonable mistake there would be no forfeiture until the lessee had been given an opportunity to correct the mistake. In reaching such a result, the Supreme Court construed the shut-in provision of the lease as follows:
"It is significant that Article 3(c) specifically designates as `royalty' the payments for wells producing gas only which cannot be marketed. Furthermore, by its position and context in the lease, Article 3(c) is associated with the falls under Article 3 which concerns the payment of royalties, thereby imparting to Article 3(c) a meaning associated with that context which requires the conclusion that the parties literally sought to designate the payments as royalties. Risinger v. Arkansas-Louisiana Gas Company, 198 La. 101, 3 So.2d 289 [1941]; Moses, Problems in Connection with Shut-In Gas Royalty Provisions in Oil and Gas Leases, 23 Tul.L.Rev. 374. Also, 27 Tul.L.Rev. 478; and 10 Loyola L.Rev. 1; Morriss v. First National Bank of Mission, Tex.Civ. App., 249 S.W.2d 269 [1952]; Malone, The Shut-In Royalty, 11 Baylor L.Rev. 19; Walker, Clauses in Oil and Gas Leases Providing for the Payment of an Annual Sum as Royalty on a Nonproducing Gas Well, 24 Tex.L.Rev., 478. No reason is apparent which would permit the interpretation that the language of the option granted by Article 3(c) permits the payment of annual delay rentals after drilling operations have resulted in a shut-in well. This is true because rental payments under Article 4 are designed only to grant the privilege of deferring commencement of drilling operations. Once, therefore, drilling operations have commenced, the lessees are relegated to continuing drilling operations, or the payment of shut-in royalties, or actual royalties to maintain the lease, or, where production ceases, resumption of delay rentals is authorized by Article 5.
* * * * * *
"Lessees contend that Article 5 permits a resort to delay rentals after a well has been shut in on the basis that shutting in of the well is contemplated in the language of Article 5, permitting the resumption of rental payments where the `production * * should cease form any cause.' This argument is without merit. A shut-in well is not dry, and, although not actually producing, it is unrealistic to say that production has ceased within the established meaning of these words. The very purpose of the shut-in well clause of oil and gas leases is to permit the lessees to maintain the lease as though it were producing. Article 3(c) refers to and gives emphatic meaning to that construction in these words: `and upon such payment it will be considered that gas is being produced within the meaning of Article 2 of this contract.' Article 2, commonly called the habendum clause, provides for the maintenance of the lease `as long * * * as oil, gas or other minerals are produced.' Shut-in wells enable the lessor to maintain the lease by the payment of shut-in royalties and hence the production, though not actual, is a substitute for actual production and is, therefore, constructive production. Another convincing factor which persuades us to consider these shut-in payments as royalties, and not as annual delay rentals, is the proviso that these payments are not payable on the annual rental-paying date designated for rental payments. Rather, shut-in payments are by the terms of the lease payable `quarterly.'
"The parties to the contract, having defined the terms used, and having applied rental payments to one situation and royalty payments to another, (the first applicable to a situation where commencement of drilling operations is to be deferred and the latter to be applicable where drilling operations have resulted in a well producing gas only for which no market exists), it follows that once drilling operations result in production, either actual or constructive, the lessees may no longer resort to rental payments, except where production should cease, in which event Article 5 would permit the resumption of rental payments."
*1098 Here, there has been no payment whatsoever nor has there been any valid reason, other than negligence, offered for such delay and failure. Although the Davis case precedes adoption of the Louisiana Mineral Code, individuals remain free to contract as they desire unless doing so is expressly or impliedly prohibited or contrary to public good. La. M.C. § 3.
In Bourgeois v. Exxon Corp., 300 So.2d 632 (La.App. 4th Cir.1974), it was held that termination of the lease is available where express terms so provide or where rental payments having an express due date are involved.
Among the issues presented in Trinidad Petroleum v. Pioneer Natural Gas, 416 So.2d 290 (La.App. 3rd Cir.1982), writ denied 422 So.2d 154 (La.1982), was whether a lease was continued in effect pursuant to force majeure provisions of the lease which provided for force majeure rentals. The lessee had brought suit against the lessor asserting the continued existence of the mineral lease and non-occurrence of a resolutory condition such as would terminate the lease. The trial judge rendered judgment in favor of the lessee. A majority of this court reversed, holding that the lessor was not required by the La.M.C. to place the lessee in default where the lease terminated upon "occurrence of an express resolutory condition, i.e., the cessation of production for a period of 60 days." 416 So.2d 298. This author dissented, being of the opinion that the terms of the lease were such that notice was a prerequisite to termination of the lease.
In Lelong v. Richardson, 126 So.2d 819 (La.App. 2nd Cir.1961), the Second Circuit traced the development of the shut-in provision. Quoting with approval the Honorable Leslie Moses' article in 23 Tul. 376, the court stated, in pertinent part:
"Generally speaking, the habendum clause of an oil and gas lease defines the term of the present day lease. Such a clause is the direct result of a natural evolution in the methods and customs of the petroleum industry, and owes its form to two compelling ideasone concerned with the desires of the lessorthe other with the needs of the lessee. Manifestly, a landowner is unwilling to grant a mineral lease for an indefinite period of time, thereby encumbering his land with a lease that is virtually non-productive of revenue.
* * * * * *
"These desires led to the development of the habendum clause which is now a familiar part of every lease. This clause safeguarded the interest of the lessor by provided for the lease's expiration at the end of a stated term; and it protected the lessee by providing for the continuance of the lease as long as production was being obtained.
* * * * * *
"In the absence of special provisions it is apparent that under the habendum clause the lease will terminate at the expiration of the primary term even though a well has been completed on the land capable of producing gas in commercial quantities, if the lessee is unable to operate the well because of lack of market for the gas. In Smith v. Sun Oil Co., (172 La. 655, 135 So. 15 (1931); cf, Caldwell v. Alton Oil Co., 161 La. 139, 108 So. 314 (1926)) the court stated that a gas well which the lessee cannot operate is not a paying proposition for either lessor or lessee, and therefore the lease terminated because of failure to produce in paying quantities. Other cases are in accord with this result.
"To protect the lessee from the hardship of losing the lease under such circumstances, there was a departure from the general rule which makes production a condition precedent to the continuation of the lease after the primary term. The royalty clause was modified by a provision which permits the lessee to pay lessor a fixed royalty on each well which is shut-in because of lack of a market or demand for the gas. The forms of the shut-in royalty provision are as varied as the lease in present day use.
* * * * * *

*1099 "The justification for the inclusion of such a clause, and its sanction by the courts, grows out of the difference between oil and gas. Oil can be removed from the ground and stored in tanks, moved in trucks or pipelines or tank cars. On the contrary, the only important storage place for natural gas is one of the natural underground reservoirs in which it is found. If there is no pipeline available, it must remain in the ground. Further, the lessor is not harmed if the lessee awaits a proper market, and, in addition, is paid shut-in royalty during the waiting period."
The Lelong court further stated:
"The same author continued his discussion of the problem in Part II of his comment, XXVII, Tulane Law Review, 478, and particularly discussed Morriss v. First National Bank of Mission, Tex.Civ. App., 249 S.W.2d 269, a 1952 Texas decision which construed the payment of shut-in royalties as preserving the rights of a lessee under the habendum clause. The Morriss case also held that shut-in payments are a substitute for production and eliminate the necessity for payment of delay rentals."
Turning to the particular question of whether a shut-in payment is a royalty the Second Circuit then reasoned:
"Under a discussion of the construction of shut-in gas payments as royalties, the following analysis is found in the Fourth Annual Institute on Oil and Gas Law and Taxation of the Southwestern Legal Foundation at pages 46 and 47:
`The Louisiana Court in Risinger v. Arkansas-Louisiana Gas Company and the Texas Court in Shell Oil Company v. Goodroe ([Tex.Civ.App. [1946]], 197 S.W.2d 395) had handed down decisions in the 1940's which, when analyzed, showed that the courts had regarded such payments as royalties, but it was not until 1952, when the case of Morriss v. First National Bank of Mission was decided that there was an authoritative holding on the point.
* * * * * *
`The San Antonio Court, speaking through Judge Pope, held that the completion of the paying gas well, which was immediately shut-in and from which no gas was sold, constituted the achievement of production under paragraph 2, the habendum clause, of the lease; that all of the incidents of the lease relative to production became operative from the time of this substitute production; and that thereafter payments under the lease were "royalties" to be paid to the participating and non-participating royalty owners, and were not "rentals".
* * * * * *
`Further, the court said that there was here involved in legal effect a producing well "such as may hold the lease indefinitely."
`This decision that such payments herein contemplated are "royalty" appears to be a sensible and sound one, doing justice the interpretation of the particular lease involved, and providing authoritative guideposts to the interpretation of other shut-in gas royalty provisions.'
"We are particularly impressed both with the conclusions and the ratio decidendi of the case of Christianson v. Champlin Refining Company, decided by the United States Circuit Court of Appeals for the Tenth Circuit and reported in 169 F.2d 207, 209 [1948], from the opinion in which we quote the following excerpts:
`The general rule is that where production results from drilling operations and the operator is unable to market the product immediately on account of lack of an available market or of pipeline connections, no forfeiture results if, by the exercise of due diligence on the part of the operator, the well is equipped and a market is obtained within a reasonable time. (Emphasis supplied).
* * * * * *

*1100 `It is implied in the very nature of the oil business that a reasonable time must intervene between the completion of the drilling operations resulting in production and the ability to market and sell the product of a well. What constitutes a reasonable time, of necessity, depends upon the circumstances surrounding the drilling of each well. Thus, a wildcat well, a considerable distance from pipeline connections and markets, cannot be actually produced in the sense that the product is marketed within the same length of time as a well that is close to such facilities.' (Emphasis supplied.)"
Prior to adoption of the present provisions of the Louisiana Mineral Code, there would be no doubt but that plaintiff's Motion for Summary Judgment is well founded. However, as noted by Professor Frederick W. Ellis in a Non-Payment of Royalty, 35 LA.L.REV. 343, "In requiring a written putting in default, furnishing a highly conditioned remedy of double damages, and expressly disfavoring cancellation, the Mineral Code has all but buried the remedy of cancellation for delay in payment of royalties." It is appellant's contention that termination of the lease is not appropriate under the circumstances of this case and the terms of the lease. We agree.
Section 133 of the Louisiana Mineral Code provides: "A mineral lease terminates at the expiration of the agreed term or upon the occurrence of an express resolutory condition." When a mineral lease is violated an aggrieved party is entitled to any appropriate relief provided by law. La. M.C. § 135. A putting in default is required in those circumstances set forth in the Civil Code and is a prerequisite to a demand for damages arising from drainage of the property leased. La.M.C. §§ 135, 136. Also, written notice is a prerequisite to judicial demand for damages or dissolution of a lease occasioned by the lessee's failure to make timely or proper payment of royalties. La.M.C. § 137. "In a case where notice of failure to pay royalties is required, dissolution should be granted only if the conduct of the lessee, either in failing to pay originally or in failing to pay in response to the required notice, is such that the remedy of damages is inadequate to do justice." La.M.C. § 141.
The requirement of notice as a prerequisite to judicial demand imposed by La.M.C. § 137, however, applies only to royalty payments. La.M.C. § 213(5) defines "Royalty" as follows:
(5) "Royalty," as used in connection with mineral leases, means any interest in production, or its value, from or attributable to land subject to a mineral lease, that is deliverable or payable to the lessor or others entitled to share therein. Such interests in production or its value are "royalty," whether created by the lease or by separate instrument, if they comprise a part of the negotiated agreement resulting in execution of the lease. "Royalty" also includes sums payable to the lessor that are classified by the lease as constructive production.
The comment following the original La. M.C. § 213 provides in pertinent part:
"... The term `royalty' also is defined to include payments classified as constructive production. This characterization would commonly include shut-in royalty payments and compensatory royalty payments that, when paid under the terms of some leases, are regarded as production under the habendum clause of the lease or otherwise as the equivalent of production. This type of payment is more fully discussed in connection with the definition of `rental,' which is expressly defined to exclude payments designated as constructive production.
The definition of the term `rental' in Article 213(3) is also necessary, particularly in connection with Articles 105-113 dealing with executive rights. The definition here given would include not only sums designated as delay rentals payable prior to drilling or mining operations or after unsuccessful operations but would also include so-called `shut-in rentals' commonly found in many oil and gas lease forms as a means of maintaining *1101 leases when a well producing gas or gaseous substances in paying quantities is shut in. Payments of this type are to be distinguished from other payments deemed to be constructive production under certain lease forms. For example another common type of lease form provides for the making of shut-in payments in the royalty clause of the lease and states that when such payments are made, it shall be considered that there is production under the habendum clause of the lease. Compensatory royalty payments may also be classified as constructive production for purposes of maintaining a lease." (emphasis added)
From the aforegoing, it is apparent that whether the remedy of cancellation is available without a putting in default depends upon the terms of the lease. With this in mind, we consider the lease in the instant case, particularly the shut-in provision. Paragraph Five states:
"5. If Lessee obtains production of minerals on said land or on land with which the lease premises or any portion thereof has been pooled, and if, during the life of this lease either before or after the expiration of the primary term, all such production is shut in by reason of force majeure or the lack either of a market at the well or wells or of an available pipeline outlet in the field, this lease shall not terminate but shall continue in effect during such shut-in period as though production were actually being obtained on the premises within the meaning of paragraph 2 hereof,[[1]] and, during the month of January of each year immediately succeeding any year in which a shut-in period occurred when all such production was so shut in, Lessee shall pay or tender, by check or draft of Lessee, to the royalty owners as royalty, for each full calendar month in the preceding calendar year that this lease was continued in force solely and exclusively by reason of the foregoing provisions of this paragraph. The owners of the royalty as of the date of such payment shall be entitled thereto in proportion to their ownership of the royalty. The provision of this paragraph shall be recurring at all times during the life of this lease. Nothing in this paragraph contained shall abridge the right of Lessee to otherwise maintain this lease in force and effect under its other provisions, and for any part of a shut-in period that this lease is otherwise being maintained in force and effect no shut-in royalty shall be due." (Emphasis supplied)
Paragraph Five designates the shut-in payments as "royalty" and not as "rental". While this designation alone is not dispositive of the question of whether these payments were royalties or rentals, the parties' choice of words does help identify their intent in constructing the shut-in provision.
That the parties intended the shut-in payments to be royalties is further supported by the wording of Paragraph Five. This paragraph states that the lease will remain in effect through the shut-in period as if actual production was being obtained on the premises. The lease also requires the shut-in payments be made to the royalty owners as royalty.
From the aforegoing, we conclude that the shut-in payment, as created by the lease in the instant case, is in the nature of a royalty. Accordingly, the notices of nonpayment of royalties and following delays, as designated in the Louisiana Mineral Code, govern the present situation.
As aforementioned, Acquisitions sent Frontier a demand for release of the lease on July 8, 1982. On July 14, 1982, Acquisitions *1102 sent Frontier a letter notifying Frontier that the lease had expired on its own terms because of Frontier's failure to pay shut-in royalties on a timely basis. On July 20, 1982, Acquisitions filed the present suit.
Frontier tendered payment for a total of fourteen months of shut-in royalties on July 27, 1982.
Frontier tendered payment of the shut-in royalties well within the thirty-day delay. No allegations of fraud have been made against Frontier. Accordingly, the remedy of cancellation was no longer available to Acquisitions.
For the reasons assigned the judgment of the trial court granting Acquisitions' motion for summary judgment and declaring the lease to be expired is reversed. All costs of this appeal are to be paid by appellee, Acquisitions, Inc.
REVERSED.
NOTES
[1] "2. Subject to the other provisions herein, this lease shall be for a period of from this date (called `primary term') and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

(a) It is the intention of the parties that this lease shall also extend and apply to all outstanding mineral rights or servitudes affecting the lands herein described as the same may revert to Lessor, his heirs, or assigns, from time to time."