## KYLE et al. v. WADLEY et al.
### No. 753.

District Court, W. D. Louisiana, Shreveport Division.

Aug. 2, 1938.

Jackson & Mayer, of Shreveport, La., for complainants.

John B. Files, of Shreveport, La., for respondents.

DAWKINS, District Judge.

Plaintiffs, as present title holders to certain lands in Red River Parish, brought this suit to cancel leases thereon executed in 1914 and 1915, by the former owners. It is charged, first, that there has not been reasonable development by the several lessees; second, the lands have not been protected from drainage by wells on adjoining properties; and third, the lessees have ceased to produce oil and gas in paying quantities.

Defendants have met the charge with the contention (not alleged in the answer) that the demand is premature, because there was no putting in default by request

for further development, by estoppel, in that plaintiffs have continued to accept royalties from production, and on the merits it is averred that the property has been fully developed.

The original bill involved the lease upon a single large tract of 1200 acres, but by amendment two additional leases upon smaller parcels, aggregating approximately another 100 acres, were added. However, in defendants' brief it is conceded that the rights of the lessees upon the two smaller tracts have been lost by abandonment and cancellation thereof is not contested.

Prior to the execution of the three leases in 1914 and 1915 to the Atlas Oil Company, all the properties were owned by Honore and Potter Palmer, Jr. All three were, through mesne conveyances transferred to the Standard Oil Company of Louisiana, which over a period of years, drilled approximately forty wells on the property, twenty-six of which were on the larger or 1200 acre tract in controversy here, and of which one was a shallow gas well. This company produced more than a million dollars worth of oil from the leases with corresponding benefits to the lessors.

On August 14, 1931, the Standard Oil Company of Louisiana assigned all three leases to Cecil M. Brickell, including all equipment, machinery, buildings, etc. thereon, except "warehouse stock", for the price of $5,000, absolving itself from all warranty, even as to the return of the purchase price. Brickell drilled one more well on the large tract, and on May 21, 1935, assigned the lease to J. K. Wadley and wife, defendants in the present suit, for the sum of $12,500, cash.

On January 1, 1918, T. J. Crichton and Will D. Mercer acquired the fee to these lands for the price of $35,000, and on January 21, 1931, Mercer sold his half interest to Crichton. Crichton died on the ——— day of ———, 1929, leaving a widow, since married to Fred L. Kyle, and minor children, who are the plaintiffs in this suit.

The two small leases contained express provisions that reasonable development meant a well to each ten acres, but the one covering the larger tract involved here, provided: "After oil shall have been discovered, in the event of the discovery of oil on said lands, the lessee shall so conduct the operation of drilling wells on said land as to reasonably develop the same without unreasonable delay between the cessation or

abandonment of work on one well and the beginning of work on another."

A map of the area made by the Standard Oil Company and offered in evidence by the plaintiffs, shows that all of the wells on the larger tract, with four exceptions, were drilled along the edges as off-sets to those on other properties. All of these were producers, except two, and were located along the eastern, southern, and western boundaries, with one in the central northern edge. The two dry holes were located respectively (No. 34) in the northwestern corner of the tract in controversy in Section 16, apparently as an off-set to a producer on the Christopher property in the same section on the west; and the other (No. 28) was slightly east of the center of the tract in the northeast quarter of Section 18. The four which were interior wells, were respectively 26, 27, 28 (the dry hole), and 29, all in the north half of Section 18. Producers were drilled surrounding this dry hole, on the north-east (No. 13), on the south-east (No. 26), on the south-west (No. 27), and on the north-west (No. 29). All of these except No. 13 were interior wells as distinguished from edge or boundary production. There was no interior drilling in Section 17, which contained approximately 420 acres or a little more than one-third of the whole tract although production was had in every instance along the borders, as well as in the small strip extending into the north-west corner of Section 16, except in the one case (No. 34), which was an off-set to a producer (No. 15) on the Christopher tract above mentioned. Out of the entire tract, the north half of section 18 alone, consisting of some 320 acres, appears to have had development approximating anything like that on the adjoining properties to the south and south-east.

Dry holes were drilled a short distance from the north-east corner of the tract (in section 9), another directly north and some three-fourths of a mile distant, in Section 8, and a third on the east in section 12, about one-fourth a mile from the boundary of the large tract. However, wells immediately east and south of this last dry hole, on one of the smaller tracts, were producers.

Wells drilled by the Gulf Refining Company (Nos. 13, 16, 17 and 18), on the Christopher tract immediately east, were never off-set although they produced substantial amounts of oil for many years.

Well No. 20, in the south-west corner of the south-east quarter of Section 17, had an initial production of 226 barrels, but no further efforts were made north of it. It is true that there were no wells on the adjoining tract at this point closer than one-fourth of a mile, except in the northwest corner of the north-east quarter of southwest quarter of section 17, and this was off-set (No. 7) by the lessees here. The three edge wells (4, 5 and 6) in the north-east quarter of Section 18, produced initially 1600, 203 and 300 barrels of oil, respectively, while, as heretofore pointed out, No. 28, in the north half of this quarter section was dry.

There is, of course, dispute between the witnesses on each side as to what, in their opinion, was reasonable development under the circumstances of this particular case. At least one of considerable experience in the field, gave it as his opinion that there should have been one well to each ten acres, as provided in the smaller leases; while a witness for the defendant thought that the wells actually drilled were all that were justified at the time. There was little chance for drainage of the interior where the lessees promptly off-set the wells of others near the borders of the tract, but which was not done in at least the four instances mentioned. The lessees, in the absence of reasonably clear circumstances, requiring a different course, were entitled to judge of the necessity for other wells. However, the main object of the lease was to produce, for the joint benefit of the lessor and lessee, all the oil that could be had, and the latter was required to drill as many wells for this purpose as appeared reasonably necessary, so long as it could be done without expending a greater sum than might be realized from the oil so produced. 40 C.J. 1065; Hutchinson v. Atlas Oil Co., 148 La. 540, 87 So. 265. It may have been considered by the Standard Oil Company, which drilled most of the wells, that there could be recovered from the property all of the available oil through the wells which were actually drilled. It is conceded, apparently, that its judgment and experience in this regard were good, and when it sold to Brickell, it had been experiencing a loss in the operations for more than a year, although at that time there were eight producing wells on the property. The evidence shows that in the tract immediately south of the approximate center of the property in question here wells have been profitably

operated by the witness Tuttle for some years.

In view of all the circumstances, I am of the opinion that there has not been adequate development, especially in Section 17, and unless other defenses presented in the case preclude that relief, the plaintiffs are entitled to have the lease canceled.

On the issue as to whether oil is or has been for the past year or two produced in paying quantities, I think the evidence preponderates rather strongly in favor of the conclusion that it has not. As previously stated, when Brickell acquired, there were eight producers and he drilled one additional well, but when, approximately four years later, he assigned to the defendants, only three were producing, and the latter have abandoned all except one (No. 30), from which some thirteen barrels a day, at the time of the trial, were being produced. The defendants, who were in possession of the figures and records which would have clearly demonstrated the cost of operating this well, failed to prove it, and it must be concluded that, if produced, this evidence would have been against them.

In view of the commonly known fact that, in many of the old oil fields of the country, in recent years, deeper drilling has proven lower and highly productive sands, the defendants, no doubt, desired to hold on to this lease for such speculative value as it may have. Notwithstanding the fact that defendants, in their answer averred that there had been full development under the lease, as a witness, Mr. J. K. Wadley, in effect, stated that there should be further drilling and that he intended to do so as soon as the system under which he handles his finances, permitted; but it was not his privilege to do this at the expense of the lessor. It is true that the lease provides: "It is expressly declared that if oil, gas or other minerals, or any of them, be found in paying quantities, then the said lessee shall become at once vested with an estate in and to all of the minerals underlying said land, with the right to produce the same and any and all of same, as long as any one of said minerals can be produced in paying quantities." However, a fair construction of this provision, I believe, means the producing in quantities which a reasonably prudent man in the particular business would think justified continuing operations, and not by a mere semblance of production, the sole apparent purpose of which was to preserve the right, when and if the lessee saw fit, at some indefinite time in the future, he might pursue further exploration. Good faith and fair dealing as between the parties is an essential pre-requisite to the preservation of their rights, the same as in any other contract. As has often been said, time is of the essence of contracts for mineral development, and one claiming such rights is held to a much higher degree of diligence than in ordinary matters.

My conclusion is that if the property has, as contended by defendants in their pleadings, been fully developed, then I can see no justification in permitting them to hold on to this large tract of land without further activity, and they should surrender it. But, on the other hand, if the position taken by the defendant Wadley on the stand, and in the brief of his counsel, that the lease still possesses valuable possibilities, is considered, then the answer is that a reasonable opportunity for the exercise of those rights has been had without it having been taken advantage of by the defendants, and the small amount of oil now being produced from Well No. 30 is not production in paying quantities within the fair meaning of the provisions of the lease in question.

As to the contention that there was no putting in default or demand for further drilling before the suit was brought, this was one of the grounds upon which the defendants argued their exception of no cause of action, which was filed and overruled before answer. I am still of the opinion that it is not well taken. See Murray v. Barnhart, 117 La. 1023, 1031, 42 So. 489; Jennings-Heywood Oil Syndicate v. Houssiere-Latreille Oil Co., 119 La. 793, 44 So. 481.

The defendants did not raise this issue of prematurity in the pleadings but only by exception of no cause of action, whereas, as stated in the answer, it was expressly averred that no further development was necessary. On the exception, the court was of the view that the conditions and circumstances were greatly different from those in Pipes v. Payne et al., 156 La. 791, 792, 101 So. 144, and especially in view of the express provision of the lease in the present case quoted above, that after oil had been discovered the lessee should "continue * * * drilling * * * and to reasonably develope without unreasonable delay between the cessation or abandonment of work on one well and the begin-

888

ning of work on another." There was no similar provision in the Pipes Case, and this was stressed by the court as one of the reasons for holding a demand for further development was necessary before action for annulment would lie. The court also found that the petition clearly indicated the property was being seriously and profitably operated and this appears to have been the underlying reason for refusing to declare a forfeiture. What was said in Hiller v. Humphreys Carbon Company, 165 La. 370, 115 So. 623, citing Pipes v. Payne et al., appears to have been more or less obiter, since the court found that the property had been adequately developed. I do not think these decisions sufficient to overrule the fully considered opinions in Murray v. Barnhart and Jennings-Heywood Oil Syndicate v. Houssiere-Latreille Oil Co., supra. Several years have elapsed since the last well was drilled on this property and it would seem that this was a clear failure to comply with the provision of the lease above quoted.

I do not think the contention, that the plaintiffs are estopped because they accepted the small royalties paid by the defendants and their assignors, merits serious consideration. These were undoubtedly due under the contract and the defendants have not in any way changed their position as to a result thereof.

There should be judgment for plaintiffs as prayed for.

Proper decree should be presented.