247 So.2d 548

Gertrude **BOUTERIE** et al.

v.

T. W. **KLEINPETER** et al.

No. 50695.

May 4, 1971.

---

Gordon, Arata & McCollam, Blake G. Arata, New Orleans, for plaintiffs-appellants-applicants.

Pugh, Lanier & Pugh, Walter I. Lanier, Jr., Francis Dugas, Thibodaux, for defendants-appellees-respondents.

· SUMMERS, Justice.

Plaintiffs Gertrude Bouterie and Alma B. Leckert instituted this suit to cancel two oil, gas and mineral leases granted by them as lessors to T. W. Kleinpeter as lessee. Kleinpeter and David J. Robichaux, Jr., were made joint defendants in the suit, Robichaux having acquired a one-half interest in the leases by assignment.

The leases are dated September 20, 1961 and affect a one-fifth interest owned by each plaintiff in an eighty-acre tract and the interest of Alma B. Leckert in a second tract containing thirteen acres, both tracts being in Lafourche Parish.

In June 1962 portions of the lands affected by these leases were included within a producing unit created by the Commissioner of Conservation. Portions of the property were thereafter included in another Conservation Commission unit created on April 1, 1963 and later revised on April 1, 1965. Again, by order of the Commissioner effective February 1, 1965, portions of the property were included in a third unit. All units contained producing wells, and plaintiffs were therefore entitled to their royalty share of the production.

Plaintiffs contend, however, that lessees breached their lease obligations by failing to make timely payments of lessors' royalties in these respects: 1) By failing to tender royalty payments for condensate productions from one unit during the period from April 1, 1963 through November 30, 1964 until December 30, 1965; 2) no royalty payments were made on gas production from one unit during the period April 1, 1963 through January 31, 1964, until March 7, 1964; and 3) no payments for gas or condensate production from another unit were made for the period June 1962 through February 1963, until May 2, 1963.

On December 9, 1964 plaintiffs wrote to lessees referring to the leases and stating:

In the past you have failed to timely pay the Lessor's royalty under the above leases on production attributable to those portions of the leased property included in producing Commissioner's Units. Despite your having been timely paid monthly by the respective unit operators all of the production proceeds attributable to such unitized portions of the leased property, you have not paid the Lessor's royalty monthly, and in fact you have permitted 2 and 3 month periods to elapse between the Lessor's royalty payments.

By your failure to pay the Lessor's royalty monthly under the circumstances hereinabove mentioned you have breached the above described leases. Formal demand is hereby made upon you to timely pay to us each month the Lessor's royalty share of all production proceeds attributable to the property covered by the above leases. Be assured that if the demand herein made for payment of Les-

sor's royalty is not complied with we shall institute the necessary legal action to cancel the said lease.

Notwithstanding the letter demand of December 9, 1964, plaintiffs allege in their suit that lessees persisted in their failure to make timely monthly payments of royalties, although plaintiffs' co-owners of the eighty-acre tract received timely monthly payments of royalties from their lessees on the gas and condensate production from the units affecting these lands.

Plaintiffs accepted and cashed all royalty payments tendered before and after the letter of December 9, 1964 until September 1, 1965, after which time they refused to negotiate checks received by them from defendants. On December 29, 1966 plaintiffs made formal demand pursuant to Section 102 of Title 30 of the Revised Statutes [1] for a termination of the leases, and, when defendants refused to comply, this suit was filed on March 8, 1967.

Each defendant filed an exception of prematurity to plaintiffs' petition, and, in

---

1. La.R.S. 30:102 provides:

"Whenever an optional oil or gas lease shall lapse because of the termination of the full period within which it may be kept alive by the payment of rentals, or because of failure on the part of the lessee to comply with the condition for the prevention of forfeiture, the lessee shall within ten days after written demand on the part of the lessor furnish the lessor with an acknowledged instrument, directing the cancellation of the lease on the records.

"If a lessee, having been given written notice demanding cancellation of the lease, fails or refuses to comply within ten days, he shall be liable to the lessor for a reasonable attorney's fee incurred by the lessor in bringing suit to have the cancellation adjudged. He shall also be liable to the lessor for all damages suffered by him by reason of his inability to make a lease because of the non-cancellation."

time, the exceptions were tried and sustained by the trial court. On appeal to the First Circuit this ruling was affirmed. 234 So.2d 812. We granted writs on plaintiffs' application. 256 La. 612, 237 So.2d 396.

The narrow question presented by the exceptions of prematurity is whether Paragraph 11 of each of the leases, which are identical, are applicable to a claimed breach of the lease obligation to pay royalties. Lessees contend that Paragraph 11 requires lessor to notify lessee in writing of the basis upon which the breach of the lease is claimed and allow sixty days to lessee to commence to comply. This provision, lessees argue, imposes a condition precedent to a suit for cancellation, and, since lessors have not complied with that condition, the suit is premature.

Paragraph 11 provides:

In the event that Lessor at any time considers that operations are not being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if legally required to conduct operations in order to maintain the lease in force, shall have sixty (60) days after receipt of such notice in which to commence the necessary operations to comply with the requirements hereof.

Lessors' position is that Paragraph 11 of the lease is not applicable to lessees' breach of their obligation to make timely and proper payment of royalties. Conceding that Paragraph 11 creates a condition precedent which must be complied with before the lease may be cancelled, lessors assert the word "operations" as used in Paragraph 11 contemplates a breach of lease obligations other than the nonpayment of royalties—that is, the breach must involve the performance or nonperformance of some physical activity on the lease leading to the production of oil or gas. Therefore, since the breach claimed here is nonpayment of royalties and not a failure to "conduct operations" under the lease, under this view, it was not necessary to give the notice required by Paragraph 11 as a prerequisite to this suit.

In order to properly present the problem in the context of the lease, all pertinent provisions wherein the word *"operations"* appear are quoted:

"Lessor, in consideration of the sum of One thousand and other considerations ($1,000.00 O.V.C.) hereby leases and lets unto Lessee, the exclusive right to enter upon and use the land hereinafter described for the exploration for, and production of oil, gas, sulphur and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership,

possession and transportation of said minerals (either from said land or acreage pooled therewith), and the right of ingress and egress to and from said lands at all times for such purposes, including the right to construct, maintain and use roads and/or canals thereon for *operations* hereunder or in connection with similar *operations* on adjoining land, and including the right to remove from the land any property placed by Lessee thereon and to draw and remove casing from wells drilled by Lessee on said land; the land to which this lease applies and which is affected hereby being situated in Lafourche Parish, Louisiana, and described as follows, to-wit: * * *.

\* \* \* \* \* \*

"Notwithstanding anything to the contrary herein contained, in the event a portion or portions of the land herein leased is pooled or unitized with other land so as to form a pooled unit or units, *operations* on or production from such unit or units will maintain this lease in force only as to the land included in such unit or units. This lease may be maintained in force as to any land covered hereby and not included in such unit or units by rental payments, rentals shall be reduced in proportion to the number of acres covered hereby and included in such unit or units. If at or after the end of the primary term this lease is being maintained as to a part of the lands by *operations* on or production from a pooled unit or units embracing lands covered hereby and other land and if at such time there be land covered hereby which is not situated in such unit or units and as to which the lease is not being maintained by *operations* or production, lessee shall have the right to maintain the lease as to such land by rental payments exactly as if it were during the primary term, provided that this lease may not be so maintained in force by rental payments more than two (2) years beyond the end of the primary term.

"It is also understood there will be no drilling *operations* in the immediate vicinity of homesite.

\* \* \* \* \* \*

"This lease shall be for a term of Three years and no months from the date hereof (called "primary term") and so long thereafter as oil, gas or some other mineral is being produced or drilling *operations* are conducted either on this land or on acreage pooled therewith * * *.

\* \* \* \* \* \*

"1. This lease shall terminate on September 20, 1962, unless on or before said date the Lessee either (1) commences *operations* for the drilling of a well on the land * * * and thereafter continues such *operations* and drilling to completion or abandonment, or (2) pays to the Lessor

* * * per acre * * * which payment shall maintain Lessee's right in effect as to such land without drilling *operations* * * *.

\*        \*        \*        \*        \*        \*

"2. * * * Drilling or reworking *operations* on or production of oil, gas, sulphur or other minerals from land included in such pooled unit shall have the effect of continuing this lease in force * * * whether or not such *operations* be on or such production be from land covered hereby * * *.

\*        \*        \*        \*        \*        \*

"4. After beginning *operations* on the lands or on acreage pooled therewith (or with any part thereof) and prior to the discovery and production of minerals in paying quantities, Lessee may maintain the rights granted during and after the primary term by continuing such *operations* without the lapse of more than ninety (90) days between abandonment of work on one well and beginning *operations* for drilling another; and during the primary terms such *operations* may be discontinued and the rights granted maintained by resuming rental payments, by paying within ninety (90) days from the discontinuance of *operations* (regardless of the fixed rental paying date) the proportion of the fixed yearly rental that the number of days between the end of said ninety (90) days and the next ensuing rental paying date bears to the twelve months' period; but, if said ninety (90) days should expire during any year for which rentals have been paid, no further rental shall be due until the next fixed rental paying date.

\*        \*        \*        \*        \*        \*

"6. After the discovery and production of oil, gas or any other mineral in paying quantities, either on the leased premises or on lands pooled therewith, the rights granted shall be maintained in effect during and after the primary term and without the payment of the rentals hereinabove provided for so long as oil, gas or some other mineral is being produced in paying quantities, or Lessee is carrying on *operations* with reasonable diligence looking to the production thereof. It is provided, however, that if, after the discovery and production of oil, gas or other minerals in paying quantities, the production thereof should cease from any cause this lease shall terminate unless Lessee resumes or restores such production, or commences additional drilling, reworking or mining *operations* within ninety (90) days thereafter and continues such *operations* without the lapse of more than ninety (90) days between abandonment of work on one well and commencement of reworking *operations* or *operations* for the drilling of another * * Should Lessee by the drilling of any well located on the land * * * discover gas

or gaseous substances capable of production * * * but which Lessee is unable to produce * * * because of lack of market or marketing facilities or Governmental restrictions, then Lessee's rights may be maintained, in the absence of production or drilling *operations,* by commencing or resuming rental payments * * * provided, however, that in no event shall Lessee's rights be so extended by rental payments without drilling *operations* or production of oil, gas or some other mineral for more than five consecutive years.

"7. Subject to the provisions of Paragraphs 2 and 10 hereof the royalties to be paid by Lessee are: (a) On oil and other liquid hydrocarbons one-fourth (¼th) of that produced and saved from the land and not used for fuel in conducting *operations* on the property (or on acreage pooled therewith) or in treating said oil to make it marketable; (b) one-fourth (¼th) of the market value of the gas sold or used by Lessee in *operations* not connected with the land leased or any pooled unit containing a portion of said land; (c) one-fourth (¼th) of the value at the mouth of the well of casinghead gas used in manufacturing casinghead gasoline to be computed by methods recognized in the industry; (d) Two Dollars ($2.00) for each ton of 2240 pounds of sulphur, payable when marketed; and (e) one-fourth (¼th) of the value of all other minerals mined and marketed.

Oil royalties shall be delivered to Lessor free of expense at Lessor's option in tanks furnished by Lessor at the well or to Lessor's credit in any pipe line connected therewith. In the event Lessor does not furnish tanks for such royalty oil and no pipe line is connected with the well, Lessee may sell Lessor's royalty oil at the best market price obtainable and pay Lessor the price received f. o. b. the leased property, less any severance or production tax imposed thereon.

* * * * * *

"8. The Lessee shall be responsible for all damages to timber and growing crops of Lessor caused by Lessee's *operations.*" (Emphasis added.)

Note: Paragraph 11, quoted in the beginning of this opinion, is the next part of the lease wherein the word "operation" is used.

█ Paragraph 11 refers to "operations" which are not "conducted" in compliance with the lease, and to a situation where lessee is legally required to "conduct operations." Where these situations exist, lessee is given sixty days after written notice to "commence the necessary operations" to comply with the requirements of the lease. Considering Paragraph 11 in the context of the lease, with particular reference to the use of the word "operations" as it occurs throughout the text, it

is apparent that Paragraph 11 does not contemplate, either by its express terms or by implication, that lessor should give written notice to lessee of failure to pay royalties and allow sixty days to comply before suit can be instituted for cancellation.

Payment of royalties is not an "operation conducted" by lessees; nor is it correct to say that the renewal of the obligation to pay royalties is the same as saying, "commence the necessary operations" as those terms are used in Paragraph 11. For instance, when Paragraph 8 of the lease refers to damage to timber and growing crops caused by lessee's operations, no one would contend "operations" there means nonpayment of royalties.

In this State we have likened the payment of royalties to rent. Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956); Milling v. Collector of Revenue, 220 La. 773, 57 So.2d 679 (1952); and Logan v. State Gravel Co., 158 La. 105, 103 So. 526 (1925). And the cases have recognized that the codal provisions applicable to ordinary leases must be applied to oil and gas leases. Melancon v. Texas Co., supra; Coyle v. North American Oil Consolidated, 201 La. 99, 9 So.2d 473 (1942); Tyson v. Surf Oil Co., 195 La. 248, 196 So.2d 336 (1940).

The pertinent provisions of the Civil Code concerning leases provide that "The lessee is bound: * * * To pay the rent at the terms agreed on.", Article 2710, and if he fails to pay the rent when due, he "may be expelled from the property," Article 2712.

Courts have, moreover, been substantially unanimous in holding that if the lessee fails to pay or tender the rental on or before the due date, the lease terminates automatically regardless of the fact that subsequent to the due date the lessee may tender the rental payment. Johnson v. Smallenberger, 237 La. 11, 110 So.2d 119 (1959); Clingman v. Devonian Oil Co., 188 La. 310, 177 So. 59 (1937); 3 Williams, Oil and Gas Law, § 606.2 (1969).

Where royalties are concerned, since no stipulated date for payment is set, the jurisprudence is to the effect that failure to pay production royalties for any appreciable length of time without justification amounts to an active breach which terminates the lease without the necessity of putting in default. Bollinger v. Texas Co., 232 La. 637, 95 So.2d 132 (1957); Melancon v. Texas Co., 230 La. 593, 89 So. 2d 135 (1956); Sellers v. Continental Oil Co., 168 So.2d 435 (La.App.1964); Pierce v. Atlantic Refining Co., 140 So.2d 19 (La. App.1962), cert. denied; and Bailey v. Meadows, 130 So.2d 501 (La.App.1961), cert. denied.

In this and similar oil leases, lessee may escape termination of his lease by paying rentals or paying royalties. He may es-

cape forfeiture by conducting operations. It is with reference to the latter method of maintaining the lease that Paragraph 11 deals. Such a notice provision is understandably included in the lease because "operations" involve such varied activity, impracticable of precise description, which in method or scope may or may not meet acceptable standards. For these reasons lessee is given an opportunity by this provision to correct failings and avoid a drastic consequence of an inadvertent breach of his obligations before the lease is forfeited. 2 Summers, Oil and Gas § 416 (1959) ; 2 Kuntz, Oil and Gas § 26.13(e) (1962).

As used in the lease, the word "operations" contemplates drilling or reworking the wells and use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession and transportation of minerals; the exercise of the right of ingress and egress to and from the land, including the right to construct, maintain and use roads and/or canals; the right to remove from the leased land any property placed by lessee thereon; the right to draw and remove casing from wells drilled by lessee on the leased land; and other like activity.

Perhaps a classic example of the situation contemplated by Paragraph 11 would occur where, after the primary term, the lessor notified lessee that he was not prose-cuting drilling operations with reasonable diligence, pointing out in the notice that the drilling crew was working only two days each week, and, consequently, lessor's property was being held for an inordinate length of time without the payment of rentals or royalties. This would enable lessee, whose reasons for the partial prosecution of drilling operation may have been warranted from his point of view, to either correct his position and remove lessor's objections if reasonable standards required the correction, or refuse to do so, dispute the contention and stand his ground.

Another example of a Paragraph 11 situation could involve a notice by lessor to lessee that his well was unnecessarily discharging large quantities of waste oil and salt water over and upon the lands of lessor in such a manner as to cause severe and extensive damage contrary to reasonable practices in the industry. Refusal to cease such a wanton disregard of lessor's rights may warrant forfeiture of the lease.

Still another example could involve lessee's failure to drill to a depth where known reserves could be found as part of an implied obligation to reasonably develop the leased premises.

Thus it has been held that erection of a derrick on the land, digging slushpits, placing three or four hundred feet of drill stem on the ground, and the patching of a road

leading to the leased land, constituted "a commencing of operations for drilling" and, hence, the lease could not be cancelled for failure to commence drilling operations within a specified time. Crye v. Giles, 200 So. 155 (La.App.1941).

And where a lease provided that should production cease from any cause, the lease should not be terminated if the lessee commenced drilling or reworking operations within sixty days thereafter, it was held that repairing the derrick, pulling the tubing from the well and repairing roads and bridges leading to the well was a commencement of reworking operations. Texas Co. v. Leach, 219 La. 613, 53 So.2d 786 (1951).

Another example of the use of the word "operations" in oil and gas leases is found in Johnson v. Houston Oil Company of Texas, 229 La. 446, 86 So.2d 97 (1956), where a drilling rig, pump, rotary and kelly joint were moved to the well site, assembled and the drilling out of cement was commenced in a plugged well. These activities were held to satisfy the requirement of reworking operations.

In Kinnear v. Scurlock Oil Company, 334 S.W.2d 521 (Tex.Civ.App.1960), lessor filed suit to cancel an oil and gas lease, alleging failure on the part of lessee to drill an offset well or wells in the immediate area of those drilled by another oil company, as provided and required by the lease, as a

reasonably prudent operator would have done. Lessor had not sent the notice required by the following clause of the lease:

In the event Lessor considers that operations are not at any time being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if in default, shall have sixty (60) days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this instrument.

In denying relief to lessor the court declared, "This is a provision giving the lessee and his successors in interest a warning period of 60 days to correct any condition that lessor asserts is a breach." The case is cited to illustrate the application of the quoted clause, almost identical with the clause in the case at bar, to a situation where the complaint of breach was the failure to drill an offset well—not a failure to pay royalties timely.

Humble Oil & Refining Co. v. Romero, 194 F.2d 383 (5th Cir. 1952), presents a situation where the lease contained a judicial ascertainment clause providing that after production the lease could not be forfeited "for failure to conduct operations" in compliance therewith until the forfeiture had been judicially ascertained and an opportunity afforded to comply. Lessor sued

to have judicially ascertained whether additional drilling was required under lessee's implied obligation to fully develop the leased premises. Here additional drilling to further develop was the "failure to conduct operations" complained of—not the nonpayment of royalties.

The identical clause at issue in the case at bar was referred to in dicta in Savoy v. Tidewater Oil Company, 218 F.Supp. 607 (W.D.La.1963), in connection with a contention that the lease should be cancelled because the well was not reworked, which was a breach of lessees' implied obligation to reasonably develop the property.

In Taylor v. Kimbell, 219 La. 731, 54 So.2d 1 (1951); Sittig v. Dalton, 195 La. 765, 197 So. 423 (1940); and Producers Oil & Gas Co. v. Continental Securities Corp., 188 La. 564, 177 So. 668 (1937), we recognized that the word "operations" used in the leases under consideration referred to drilling operations, and notice of failure to comply with a requirement that "operations" were not being conducted in accordance with the lease had no application where the lease was otherwise terminated by its terms.

Although the question presented for resolution in the case at bar does not involve a claimed default based upon failure to timely drill or conduct reworking operations, Paragraph 11 contemplates such a claim, a claim that this type physical "operation" is not being "conducted" as required by reasonable standards under the circumstances. The cases cited, therefore, illustrate the type situation Paragraph 11 was designed to cover. We have been unable to find any case wherein it was contended that nonpayment or untimely payment of royalties was a failure to "conduct operations" as required by the lease.

Paragraph 6 stipulates that, after the discovery of oil, gas or any other mineral, the lease remains in effect so long as there is production in paying quantities, "or Lessee is carrying on operations with reasonable diligence looking to the production thereof." Obviously "operations" as used there has no relation to the proper or timely payment of royalties, but relates, instead, to the physical activity associated with the attempt to discover or maintain production. The same is true of the use of the word "operations" elsewhere in the lease, as reference to the extensive quotations from the lease will readily disclose. La.Civil Code arts. 1948, 1955.

■ A statutory definition for the term "operations for oil and gas" found in Williams and Meyers, Oil and Gas Law (Manual of Terms) 270 (1969), helps us to recognize the type activity the term "operations" connotes in the oil and gas industry, viz.:

The exploring, testing, surveying or otherwise investigating the potential of

the subject lands for oil or gas, the active drilling or preparation for drilling of wells therefor, or any other actions directed towards the eventual production or attempted production of oil and gas from such lands (Burns' Ind.Stat.Ann. § 46–1801 [e]).

Although not controlling, our research is significant. Drilling or reworking wells and other similar activity has often been considered "operations" in oil and gas leases, whereas the nonpayment of royalties has never been considered a failure to "conduct operations." La.Civil Code art. 1953. And there is no sound reason to make the express obligation to pay rentals or royalties subject to a notice of default clause. Brumby, Negotiations from Lessor's Viewpoint, L.S.U. Seventh Annual Institute on Mineral Law 45 (1960). Provisions similar to Paragraph 11 have been considered applicable to nonperformance of lease provisions which bring about a forfeiture, as distinguished from nonpayment of rentals and royalties or expiration of the lease term without production which bring about a termination of the lease. 2 Kuntz, Oil & Gas § 26.13(e) (1962). It is this usage which is relevant to the problem before us. Usage of a term in the oil and gas industry is more persuasive in determining its meaning than dictionary definitions. La.Civil Code arts. 1946, 1947. Thus words in the contract are not necessarily their detached meaning as defined in dictionaries. 2 Kuntz, Oil and Gas § 19.10 (1962).

We hold, therefore, that the term "operations" as used in Paragraph 11 of the leases does not refer to the nonpayment or untimely payment of royalties.

In support of their exceptions of prematurity, defendants relied heavily upon the decision in Bollinger v. Republic Petroleum Corporation, 194 So.2d 139 (La.App.1966), cert. denied, 250 La. 463, 196 So.2d 276 (1967), where the defendant drilled and completed a shut-in gas distillate well on the lease granted by plaintiff to defendant's assignor. The lease contained the usual shut-in gas provision providing for lease maintenance without actual production by paying quarterly shut-in gas payments. A portion of the lease had also been placed in a unit established for a producing oil well. Plaintiff lessor sought cancellation of the lease for failure of lessee to pay shut-in gas payments as required by the lease agreement and failure to pay oil royalty. An exception of prematurity was filed by lessee based on Paragraph 9 of the lease, which read:

(9) In the event Lessor considers that Lessee has failed to comply with *one or more of its obligations hereunder, either expressed or implied,* Lessor shall notify Lessee in writing setting out specifically in what respects Lessor claims Lessee has breached the lease. The service of

such notice and the lapse of thirty (30) days without Lessee's meeting or commencing to meet the alleged breaches shall be a condition precedent to such action by Lessor on this lease. If within thirty (30) days after receipt of such notice Lessee shall meet or commence to meet the breaches alleged by Lessor, Lessee shall not be deemed in default hereunder. Neither the doing by Lessee of any acts aimed to meet all or any of the alleged breaches, nor its failure so to act, shall be deemed an admission or presumption that Lessee has failed to perform any of its obligations hereunder. (Emphasis added.)

Defendants also filed an answer resisting plaintiff's demand for cancellation because, (1) an agreement of compromise had been entered into as a result of prior litigation, and (2) defendant had previously overpaid oil royalties to plaintiff, and it was only recouping overpayment. The court held that, as to these claimed breaches of the lease contract, Paragraph 9 required notice as a condition precedent to bringing an action for cancellation; and since the notice had not been given, the suit could not be maintained.

The lease provision providing for notice and delay in the Bollinger Case is distinguishable in vital aspects from the lease provision before us in the case at bar. The Bollinger lease provided for notice if *one or more of the lessee's obligations under the lease, either expressed or implied* were considered unfulfilled. This is a broad and general provision which contemplates any and all breaches of any contract obligation, including the nonpayment of royalties; whereas, the lease in the case at bar is particular, requiring notice and delays only where "operations are not being conducted in compliance with this lease." By use of the word "operations" in this clause the notice provision is restricted to a certain category of obligations. By this restrictive language rental payments and royalty payments are excluded from the intendment of that paragraph. The contractual notice and delay are, therefore, not prerequisites to suit where nonpayment of royalties is alleged. Notice and delays, if required as prerequisites to suit for nonpayment of royalties, not being provided for by the lease contract, would be governed by the general law and court decisions in like situations. The exceptions of prematurity, based upon failure to comply with the condition precedent (notice) contained in Paragraph 11, must therefore be overruled where nonpayment of royalties is alleged as a basis for the exception.

■ Although, at the trial of the exceptions of prematurity, evidence was introduced showing the amounts and dates when royalties were paid, this was done over objection, and this evidence was not relevant to the issue before the Court. The

only proper issue presented was the question we have considered. There has been no determination of whether there were delays in royalty payments and, if so, whether the delays were unjustified.

At the trial of the exceptions of prematurity, counsel for plaintiff lessors entered into the record a statement that the letter of December 9, 1964 "was not sent pursuant to Paragraph Eleven of either of the leases, because we consider Paragraph Eleven completely immaterial to the cause of action sued upon here." Counsel does argue here, however, that the letter, a written demand upon lessee to make timely monthly payment of royalties accruing under the mineral leases, was sufficient to formally place lessees in default under the facts and the law applicable to this question, since there was no contractual requirement for notice of breach of the obligation to pay royalties. The issue thus presented is predicated upon a determination of fact: Whether royalties were paid timely and whether, if untimely payments were made, justification for the delay existed. These questions are to be determined on remand.

For the reasons assigned, the judgment appealed from is reversed and set aside, the exceptions of prematurity filed by defendants are overruled and this case is remanded to the trial court for further proceedings in keeping with the reasons assigned.