Charles William MASSIE, III

v.

INEXCO OIL COMPANY.

Civ. A. No. 84–0384.

United States District Court,
W.D. Louisiana,
Lafayette-Opelousas Division.

July 12, 1985.

Carl W. Cleveland, New Orleans, La., for plaintiff.

John M. McCollam, New Orleans, La., for defendant.

EDWIN F. HUNTER, Jr., Senior District Judge.

Plaintiff, Massie, is suing to partially cancel an oil, gas and mineral lease dated October 14, 1977, granted to defendant (Inexco), as lessee, by Mr. Massie and his co-owners. The right of cancellation asserted is restricted to Massie's undivided one-twelfth (¹/₁₂th interest) in the lease.[1]

---

1. The lease contains fifteen (15) additional named lessors or their assigns. Some of these lessors have filed a suit asserting the same cause of action as plaintiff here. Others by way of an application for intervention sought to underscore by the utilization of strong language that they considered INEXCO to be a trespasser. We denied the motion to intervene and our

The basic thrust of his claim is that under the provisions of paragraph thirty-three (33) of the lease, Inexco forfeited all leasehold rights to subsurface horizons deeper than one hundred (100') feet below the depth of the deepest horizon from which the lessee had established production, as of the date of the expiration of the "primary term" on October 13, 1980.

Conversely, Inexco insists that the clause upon which Massie relies applies by its express terms, only in the event that the lease is being maintained at the expiration of the primary term solely by production, and does not preclude maintenance of the lease by other ongoing and continuous drilling operations. The argument is made that the lease may be extended beyond the primary term into a secondary term by "continuous drilling". Paragraph V expressly provides for the transition of the lease from the primary term into a secondary term by drilling or production or both, while paragraph XII expressly grants the lessee the right to conduct drilling operations on the leased premises beyond the expiration of the primary term.

The basic issue is quite precise. Does paragraph thirty-three (XXXIII) operate as an absolute cut-off at the end of the primary term so as to require the lessee to release all depths 100 feet below the deepest productive depth when the lease is being maintained only by production? Counsel agree that the contract language is clear and explicit. They argue, too, that the meaning and intent of the parties must be sought within the four corners of the lease contract and cannot be explained or contradicted by parol evidence.[2]

### THE LEASE [3]

Under the traditional form of "unless" oil, gas and mineral lease, the leasehold is granted for a term of years (the primary term) and for so long thereafter as there is production from the leased premises or other specified operations are prosecuted on the premises. Thus, a lease will typically be maintained in effect at the expiration of the primary term if a well (or wells) thereon is producing in paying quantities *or* if the lessee is then engaged in drilling or reworking operations with a view toward obtaining or increasing production. *Generally speaking, such drilling operations will preserve the existence of the lease for so long as such operations continue without cessation for longer than a specifically stated period, commonly sixty (60) or ninety (90) days.*

Under the "habendum" or granting provisions of the Subject Lease (which are contained in paragraphs one (I) and five (V)), plaintiff and his co-lessors grant to Inexco the right to explore for and to produce oil, gas and other liquid or gaseous hydrocarbon minerals from the leased premises for the stated three (3) year primary term, and for so long thereafter as (i) oil, gas or other hydrocarbon minerals are produced from the leased premises or (ii) "operations are being conducted by lessee" sufficient to maintain the lease in force. Then, too, one of the types of "operations" sufficient to maintain the lease in force after the expiration of the primary term are "drilling operations". Such "drilling operations" are referenced in paragraphs ten (X) and eleven (XI) and an explicit "drilling operations" grant applicable is found in paragraph twelve (XII) of the lease, to-wit:

"XII. After the primary term and after beginning operations for the drilling of a well hereunder, Lessee shall have the right to make as many attempts to discover oil, gas and/or other liquid or gaseous hydrocarbon minerals as Lessee

order doing so is made a part hereof by reference. We are now advised by counsel that these applicants for intervention have amicably settled their differences with INEXCO.

2. Both parties sought Summary Judgment. It was obvious that the case could be tried in several hours and that it involved millions of

dollars. We denied the motions and promptly set the matter for trial.

3. A copy of the lease was received in evidence and is attached. [*Ed. note*: the lease was not published as its pertinent parts were incorporated in the opinion.]

882

pleases; provided however, that except as otherwise provided herein, such attempts shall be successive in the sense that not more than ninety (90) days shall lapse from the date of cessation of work on one well and the commencement of drilling operations (which are herein defined to mean beginning operations and the prosecution thereof with due diligence and spudding in within ninety (90) days) on another, or of reworking operations on the same well, and provided, further, that such operations shall be carried out diligently and in good faith in an effort to develop the premises as herein contemplated. The right of Lessee to commence operations for the reworking of a well or wells within ninety (90) days after cessation of production shall also be applicable to a producing well or wells which has or have ceased to produce, as defined herein." [4]

The lease also contains a clause which explicitly sets out the various causes for "automatic termination" of the lease (which is in essence a compliation of the resolutory conditions to which exercise of the lessee's granted rights are made subject), viz:

"XXX. Should Lessee fail to comply with the requirements hereof relating to the drilling of successive wells hereunder, or with reference to the drilling of offset wells or with reference to the payment of royalties (including 'in lieu' royalties), or with reference to the payment of rentals, all of Lessee's rights of every kind and nature whatsoever shall lapse, cease and end, and this lease shall terminate ipso facto as of the date of such default ..." [5]

Finally, the lease contains what Massie insists is clear and unambiguous and must be applied to limit Inexco's lease to 100 feet below the deepest depth produced in the primary term.

"XXXIII. Notwithstanding anything to the contrary herein contained, any acreage which may be held by Lessee, its successors or assigns, at the end of the primary term by the production of oil, gas or other hydrocarbon minerals under the terms and conditions provided in this lease shall be held only to a depth of one hundred (100) feet below the stratigraphic equivalent of the base of the deepest horizon from which Lessee, its successors or assigns, shall have established production of oil, gas or other hydrocarbon minerals in paying quantities during the primary term. Lessor reserves all oil, gas and other hydrocarbon minerals below the aforesaid depth after the end of the primary term of this lease, and this lease shall terminate as to all lower depths." [6]

THE FACTS

The parties have entered into a stipulation of facts. This stipulation appears in the record. We review the highlights.

1. The primary term extended for a period of three (3) years from the effective date of the lease. The primary term expired at the end of the day on October 13, 1980.

2. Between the date of the confection of the Lease and the expiration (on October 13, 1980) of the primary term, the deepest horizon from which Inexco established commercial production of oil, gas or other hydrocarbon minerals from a well located on lands covered by the Subject Lease was the horizon designated as the DB–3 Sand Reservoir A, Forked Island Field, which sand occurs at the subsurface depths of 13,418' to 13,448' (electric log measurements) in the Inexco Oil Company Miller-Massie-Summers No. 3 Well.

3. The chronology of the drilling by Inexco of four (4) wells (three on the property covered by the Subject Lease and one on adjacent property), during the general time frame of the October 13, 1980 termination date of the primary term, is pertinent.

4. Page eighteen (18) of the Lease.

5. Page twenty-nine (29) of the Lease.

6. Page thirty-one (31) of the Lease.

4. (a) The Inexco Oil Company Miller-Massie-Summers No. 3 Well was spudded on December 28, 1979, and was successfully completed as a producer on June 21, 1980 in the DB–3 Sand.

(b) The Inexco-Miller-Massie-Summers No. 4 Well was spudded on October 3, 1980 (ten (10) days prior to the expiration of the primary term) and was drilled continuously until December 6, 1980, at which time it was lost due to downhole drilling conditions.

(c) The Inexco-Miller-Massie-Summers No. 5 Well was spudded on this Lease on February 26, 1981, after abandonment of the Inexco-Miller-Massie-Summers No. 4 Well, and was drilled continuously until April 29, 1981, at which time it was lost due to adverse downhole drilling conditions.

(d) During the period that the Inexco-Miller-Massie-Summers No. 4 Well was being drilled, another well, the Inexco-Broussard No. 4 (hereinafter the "Broussard No. 4 Well"), was drilled by Inexco on an adjacent lease and successfully completed as a producer in the Planulina B Sand. This completion occurred on November 6, 1980.

4. The Broussard No. 4 Well was unitized by Office of Conservation on April 23, 1981, and became effective on March 10, 1981. The order of the Commissioner of Conservation of the State of Louisiana created a unit for the PLAN B RA SUA (Planulina B, Reservoir A, Sand Unit A). The PLAN B RA SUA includes a portion of the property covered by the Subject Lease, and the referenced Order provides that 46.72681% of the production derived from the unit be attributed to the property covered by the Lease, here under attack.

5. Production from the Broussard No. 4 Well, as presently completed in the PLAN B RA SUA, is derived from a subsurface horizon which is deeper than one hundred (100′) feet below the deepest horizon in which Inexco had established commercial production as of the end of the primary term of the Subject Lease.

6. By letter dated July 16, 1981, plaintiff made written demand on Inexco for a release of all lands then affected by the Subject Lease below a depth of 13,548 feet.

7. By letters dated July 30, August 3 and August 21, 1981, Inexco responded to plaintiff's demand letter of July 16, 1981. Inexco declined to furnish plaintiff with the requested release; however, Inexco did provide plaintiff with a release of that portion of the Subject Lease lying outside of the two units affecting the area (i.e., the DB–3 RA SUA created by Order No. 1054–A and the PLAN B RA SUA created by Order No. 1054–C) and as to all depths one hundred (100′) feet below the stratigraphic equivalent of the deepest producing depth established in the Broussard No. 4 Well, viz. the PLAN B RA SUA.

8. Plaintiff has at all times since October 13, 1980 accepted royalty payments tendered to him by Inexco attributable to his interest in both the DB–3 Unit and the PLAN B RA SUA Unit and continues to accept such royalty payments at the present time.

## THE LAW

■ This diversity case concerns title to Louisiana property. The substantive law of Louisiana applies. Louisiana's codal provisions applicable to ordinary leases apply to mineral leases. *Williams v. Humble Oil and Refining Company*, 435 F.2d 772 (5th Cir.1970); *Davis v. Laster*, 242 La. 735, 138 So.2d 558 (La.1962); *Bouterie v. Kleinpeter*, 258 La. 605, 247 So.2d 548 (1971).

■ We are obliged to give legal effect to written contracts according to the true intent of the parties and this intent is to be determined by words of the contract when these are clear, explicit and lead to no absurd consequences. La.C.C. Art. 2046 (1985). The meaning and intent of the parties in such cases must be sought from the four corners of the lease agreement and cannot be explained or contradicted by parol evidence. *Quintana Petroleum Corporation v. Alpha Inc., Corp.*, 435 So.2d 1092 (La.App.1983). However, when the terms of a written contract are susceptible to more than one interpretation, or there is

uncertainty or ambiguity as to its provisions, or the intent cannot be ascertained from the language employed—parol evidence is admissible to clarify the ambiguity and to reveal the intention of the parties. *Carters Insurance Agency, Inc. v. Franklin,* 428 So.2d 808 (La.App. 1st Cir.1983).

As was observed by Judge Wisdom in the case of *Williams v. Humble Oil,* 432 F.2d 165 (5th Cir.1970):

"It is well settled in Louisiana that mineral leases are construed as leases generally and that the codal provisions applicable to ordinary leases must be applied to mineral leases whenever they are pertinent." *Melancon v. Texas Co.,* 1956, 230 La. 593, 89 So.2d 135, 142.

Louisiana Codal provisions (1985) pertinent here are:

*Art. 2045.* Interpretation of a contract is the determination of the common intent of the parties.

*Art. 2046.* When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties intent.

*Art. 2047.* The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter.

*Art. 2048.* Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract.

*Art. 2049.* A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.

*Art. 2050.* Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.

*Art. 2051.* Although a contract is worded in general terms, it must be interpreted to cover only those things it appears the parties intended to include.

*Art. 2052.* When the parties intend a contract of general scope but, to eliminate doubt, include a provision that describes a specific situation, interpretation must not restrict the scope of the contract to that situation alone.

*Art. 2053.* A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.

*Art. 2056.* In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.

A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party.

*Art. 2057.* In case of doubt that cannot be otherwise resolved, a contract must be interpreted against the obligee and in favor of the obligor of a particular obligation.

Yet, if the doubt arises from lack of a necessary explanation that one party should have given, or from negligence or fault of one party, the contract must be interpreted in a manner favorable to the other party whether obligee or obligor.

### CLEAR, EXPLICIT AND UNAMBIGUOUS AND IN FOUR CORNERS

The lease recites in its concluding paragraph that it "is the product of the joint negotiations of lessee and lessor, and has been prepared jointly by them." Fully aware of the substantial contentions so ably presented, we must begin with the language and the assumption that the ordinary meaning of that language accurately expresses the purpose. In so doing, we must abide by tenets of contract construction and seek to ascertain the true intentions of the parties by examining the entire writing in an effort to harmonize and give effect to all pertinent provisions so that none will be rendered meaningless.

Ambiguity in the terms of a lease occurs when there are two or more inconsistent interpretations both of which are reasonable. We agree with counsel for Massie and Inexco that the contract is clear, explicit, unambiguous and is susceptible to only one clear and explicit interpretation. We agree with counsel, too, that the meaning and intent of the parties is not absurd and is clear within the "four corners rule" and cannot be explained or contradicted by parol evidence. *Chevron v. Belco*, 755 F.2d 1151, 1154 (5th Cir.1985). Article 2046 of the Louisiana Civil Code (1985).

■ Analysis must be focused on the specific language. Inexco suggests that the second sentence of paragraph 33 is simply a reiterative reinforcement of the depth limitation set out in the first sentence (i.e.) that production *alone* will maintain the lease only as to depths above a depth of 100′ below the base of the then deepest producing horizon, *but that the lessee can otherwise be maintained by continuous drilling operations* under paragraph XII. Their argument is novel and depends upon several holding blocks. We recite them. First, the second sentence of the last paragraph of XXXIII occurs in the same paragraph which expresses the effect of production at the end of the primary term, which is the only place which addresses "depth limitation". Secondly, the second sentence expressly refers to "the aforesaid depth", which refers to the depth limitation described in the preceding sentence of the same paragraph. The issue quickly narrows: What is the "aforesaid depth"? Inexco insists that it can only be the deepest depth held *only* by production, and then explicitly reiterates its dominant theme:

> "The last sentence has no limiting effect as to those depths which might be held by means other than production, namely, the continuous drilling of wells on the leased premises in a good faith effort to discover previously untested deeper horizons."

This perception has been ably argued. But, one might well ask, would not this require a reconstruction of the first sentence of XXXIII to add— *"and after the end of continuous drilling operations"*? The answer has to be "Yes".

We conclude that paragraph XXXIII operates as an absolute cutoff at the end of the primary term without any additional rights under the continuous drilling clause to explore deeper depths when and where the lease is being held by production at the end of the primary term. Paragraph XXXIII is, of course, irrelevant in the absence of production. If there had been no production, then paragraph XII would have entered the picture. When the two paragraphs are read together, a plausible construction becomes apparent. The landowner wanted Inexco to develop the land. If production was not achieved during the primary term, Inexco could utilize paragraph XII to keep the lease alive. On the other hand, if there was production during the primary term, the landowner did not want the lessee to have the rights to minerals located at an indefinite depth for an underterminate length of time. Rather, the lessor intended to, at the end of the primary term, cut off the lessee's rights to minerals located below the deepest horizon upon which production had been established.

This is the purpose of paragraphs XII and XXXIII. The two mold perfectly. We again recite paragraph XXXIII:

> "XXXIII. *Notwithstanding anything to the contrary herein contained,* any acreage which may be held by Lessee, its successors or assigns, at the end of the primary term by the production of oil, gas or other hydrocarbon minerals under the terms and conditions provided in this lease *shall be held only to a depth of one hundred (100) feet below the stratigraphic equivalent of the base of the deepest horizon from which Lessee,* its successors or assigns, *shall have established production* of oil, gas or other hydrocarbon minerals in paying quantities during the primary term. *Lessor reserves all oil, gas and other hydrocarbon minerals below the aforesaid depth after the end of the primary term of*

*this lease, and this lease shall terminate as to all lower depths.''* (Underscoring emphasis ours)

The explanatory statements made in this paragraph XXXIII are clear, precise and unambiguous:

"Notwithstanding anything to the contrary herein contained";

"Lessor reserves all oil, gas and hydrocarbon minerals below the aforesaid depth after the end of the primary term of this lease, and this lease shall terminate as to all lower depths;"

"this lease shall be held only to a depth of 100 feet below the stratigraphic equivalent of the base of the deepest horizon from which lessee—shall have established production—".

This court's interpretation of the depth limitation clause does not negate the express right given to the lessee under the "continuous drilling operations clause" to explore that part of the leased premises within the depth limitation after the expiration of the primary term. This is an important privilege.[7]

Our interpretation in no way restricts the right of the lessee to keep the lease alive at all depths *in the absence of production* after the expiration of the primary term— by resort to the "continuous drilling operations clause." We have endeavored to analyze each provision in light of the other provisions so that each is given the meaning suggested by the contract as a whole. This has been done in a manner which renders no part of the lease meaningless.

Plaintiff is entitled to judgment applying the depth limitation clause as written and decreeing the cancellation of the lease to that extent as to his interest, and ordering Inexco to make an accounting to him for post-production.

### PLAINTIFF'S CLAIM FOR CANCELLATION OF ENTIRE LEASE

■ Plaintiff suggests that the Lease should be ordered cancelled in its entirety because Inexco has elected to contest the lessor's demand for a cancellation of the lease as to all depths below a depth 100 feet below the DB–3 Sand. We do not agree with Inexco's remark that this claim is reflective of plaintiff's attitude concerning the rights of the lessee, but we agree wholeheartedly that plaintiff cannot use the concurrent issue to divest the lessee of its fairly bargained for and earned rights as to that part of the lease being held by production. This theory has no jurisprudential ancestry in Louisiana law. We agree, too, that there is not one iota of proof that defendant has acted in bad faith in any particular of its performance under the lease thus making "entire cancellation" totally inappropriate. The claim for cancellation of the entire lease is rejected.

### LESSEE'S WAIVER ARGUMENT

■ The waiver argument has no merit. The acceptance of royalties does not estop the landowner from asserting his rights under the lease. This principle has been settled in a number of cases. *Miller v. Kellerman,* 228 F.Supp. 446, 447 (W.D.La. 1964); *Broussard v. Phillips Petroleum Co.,* 160 F.Supp. 905, 913 (W.D.La.1958); *Kyle v. Wadley,* 24 F.Supp. 884, 888 (W.D. La.1938). *Miller* and *Broussard* were written by this court. The estoppel argument was reviewed and denied. Both opinions were affirmed by the Fifth Circuit United States Court of Appeals. *Kellerman v. Miller,* 354 F.2d 46 (5th Cir.1965), *Phillips Petroleum Co. v. Broussard,* 265 F.2d 221 (5th Cir.1959). *Broussard* was cited, quoted and approved as a correct application of Louisiana law. *Pierce v. Atlantic Refining Co.,* 140 So.2d 19, 23 (La. App. 3rd Cir.1962).

### FINALLY

By stipulation of the parties, the issue of lease cancellation was bifurcated from all

---

**7.** Paragraph X of the Subject Lease (Plaintiff's Exhibit 1) *restricts* the conservatory effect of production to 40 acres around a producing oil well and 160 acres around a producing gas well, or the area encompassed in a unit or units around said well or wells.

other issues for trial, including an accounting by Inexco for past production, the amount and recoverability of well costs for drilling, completing and producing the well at issue. It is apparent from the record that the value of the production at issue in these proceedings is significant. Defendant estimates total reserves attributable to the MMS lease, to be approximately fifteen million dollars ($15,000,000). For these reasons, we will enter a Rule 54(b) certification.

Counsel are instructed to submit an appropriate judgment terminating the lease as to all depths below one hundred (100') feet of the deepest formation from which production was achieved during the primary term. The judgment is to include an order bringing it within the ambit of Rule 54(b) of the Federal Rules of Civil Procedure.